TRIMBLE ET AL. *v.* GORDON ET AL.

No. 75–5952.   Argued December 7, 1976—Decided April 26, 1977

POWELL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., filed a dissenting statement, *post*, p. 776. REHNQUIST, J., filed a dissenting opinion, *post*, p. 777.

*James D. Weill* argued the cause for appellants. With him on the briefs were *Devereux Bowly, Charles Linn,* and *Jane G. Stevens.*

*Miles N. Beermann* argued the cause for appellees. With him on the brief was *Fred Klinsky.**

MR. JUSTICE POWELL delivered the opinion of the Court.

At issue in this case is the constitutionality of § 12 of the Illinois Probate Act[1] which allows illegitimate children to inherit by intestate succession only from their mothers. Under Illinois law, legitimate children are allowed to inherit by intestate succession from both their mothers and their fathers.[2]

I

Appellant Deta Mona Trimble is the illegitimate daughter

---

*Eric M. Lieberman, Norman Dorsen, Melvin Wulf,* and *Joel M. Gora* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

[1] Ill. Rev. Stat. c. 3, § 12 (1973). Effective January 1, 1976, § 12 and the rest of the Probate Act of which it was a part were repealed and replaced by the Probate Act of 1975, Public Act 79–328. Section 12 has been replaced by Ill. Rev. Stat. c. 3, § 2–2 (1976). Although § 2–2 of the Probate Act of 1975 differs in some respects from the old § 12, that part of § 12 that is at issue here was recodified without material change in § 2–2. As the opinions below and the briefs refer to the disputed statutory provision as § 12, we will continue to refer to it that way.

[2] Ill. Rev. Stat. c. 3, § 2–1 (b) (1976).

of appellant Jessie Trimble [3] and Sherman Gordon. Trimble and Gordon lived in Chicago with Deta Mona from 1970 until Gordon died in 1974, the victim of a homicide. On January 2, 1973, the Circuit Court of Cook County, Ill., had entered a paternity order finding Gordon to be the father of Deta Mona and ordering him to pay $15 per week for her support.[4] Gordon thereafter supported Deta Mona in accordance with the paternity order and openly acknowledged her as his child. He died intestate at the age of 28, leaving an estate consisting only of a 1974 Plymouth automobile worth approximately $2,500.

Shortly after Gordon's death, Trimble, as the mother and next friend of Deta Mona, filed a petition for letters of administration, determination of heirship, and declaratory relief in the Probate Division of the Circuit Court of Cook County, Ill. That court entered an order determining heirship, identifying as the only heirs of Gordon his father, Joseph Gordon, his mother, Ethel King, and his brother, two sisters, and a half brother.[5] All of these individuals are appellees in this appeal, but only appellee King has filed a brief.

The Circuit Court excluded Deta Mona on the authority of the negative implications of § 12 of the Illinois Probate Act, which provides in relevant part:

> "An illegitimate child is heir of his mother and of any maternal ancestor, and of any person from whom his mother might have inherited, if living; and the lawful issue of an illegitimate person shall represent such person and take, by descent, any estate which the parent would

---

[3] There is some dispute over the status of Jessie Trimble in this litigation. It has been argued that she is in the case only as the next friend of her daughter. As the question is relevant only to the claim of sex discrimination against the mothers of illegitimate children, an issue we do not reach, we need not resolve the dispute.

[4] App. 8.

[5] *Id.*, at 14.

have taken, if living. A child who was illegitimate whose parents inter-marry and who is acknowledged by the father as the father's child is legitimate." [6]

If Deta Mona had been a legitimate child, she would have inherited her father's entire estate under Illinois law.[7] In rejecting Deta Mona's claim of heirship, the court sustained the constitutionality of § 12.

After a notice of appeal was filed, the Illinois Supreme Court entered an order allowing direct appeal of the decision of the Circuit Court, bypassing the Illinois Appellate Court. Appellants were granted leave to file an *amicus* brief in two pending consolidated appeals which presented similar challenges to the constitutionality of § 12. On June 2, 1975, the Illinois Supreme Court handed down its opinion in *In re Estate of Karas,* 61 Ill. 2d 40, 329 N. E. 2d 234 (1975), sustaining § 12 against all constitutional challenges, including those presented in appellants' *amicus* brief.[8] On September 24, 1975, oral argument was held in the instant case. Chief Justice Underwood orally delivered the opinion of the court from the bench, affirming the decision of the Circuit Court on the authority of *Karas.* A final judgment was entered on October 15, 1975.[9]

We noted probable jurisdiction to consider the arguments that § 12 violates the Equal Protection Clause of the Fourteenth Amendment by invidiously discriminating on the basis of illegitimacy and sex.[10] 424 U. S. 964 (1976). We

---

[6] See n. 1, *supra.*

[7] See n. 2, *supra.*

[8] For purposes of its decision, the court assumed that the children had been acknowledged. There is no mention of a prior adjudication of paternity.

[9] App. 54–56.

[10] Not presented here is the appellants' contention below that § 12 discriminates on the basis of race because of its alleged disproportionate impact on Negroes.

now reverse. As we conclude that the statutory discrimination against illegitimate children is unconstitutional, we do not reach the sex discrimination argument.

## II

In *Karas,* the Illinois Supreme Court rejected the equal protection challenge to the discrimination against illegitimate children on the explicit authority of *Labine* v. *Vincent,* 401 U. S. 532 (1971). The court found that § 12 is supported by the state interests in encouraging family relationships and in establishing an accurate and efficient method of disposing of property at death. The court also found the Illinois law unobjectionable because no "insurmountable barrier" prevented illegitimate children from sharing in the estates of their fathers. By leaving a will, Sherman Gordon could have assured Deta Mona a share of his estate.

Appellees endorse the reasoning of the Illinois Supreme Court and suggest additional justifications for the statute. In weighing the constitutional sufficiency of these justifications, we are guided by our previous decisions involving equal protection challenges to laws discriminating on the basis of illegitimacy.[11] "[T]his Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose." *Weber* v. *Aetna*

---

[11] This case represents the 12th time since 1968 that we have considered the constitutionality of alleged discrimination on the basis of illegitimacy. The previous decisions are as follows: *Mathews* v. *Lucas,* 427 U. S. 495 (1976); *Beaty* v. *Weinberger,* 478 F. 2d 300 (CA5 1973), summarily aff'd, 418 U. S. 901 (1974); *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Griffin* v. *Richardson,* 346 F. Supp. 1226 (Md.), summarily aff'd, 409 U. S. 1069 (1972); *Davis* v. *Richardson,* 342 F. Supp. 588 (Conn.), summarily aff'd, 409 U. S. 1069 (1972); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Labine* v. *Vincent,* 401 U. S. 532 (1971); *Glona* v. *American Guarantee & Liability Ins. Co.,* 391 U. S. 73 (1968); *Levy* v. *Louisiana,* 391 U. S. 68 (1968).

*Casualty & Surety Co.,* 406 U. S. 164, 172 (1972). In this context, the standard just stated is a minimum; the Court sometimes requires more. "Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny . . . ." *Ibid.*

Appellants urge us to hold that classifications based on illegitimacy are "suspect," so that any justifications must survive "strict scrutiny." We considered and rejected a similar argument last Term in *Mathews* v. *Lucas,* 427 U. S. 495 (1976). As we recognized in *Lucas,* illegitimacy is analogous in many respects to the personal characteristics that have been held to be suspect when used as the basis of statutory differentiations. *Id.,* at 505. We nevertheless concluded that the analogy was not sufficient to require "our most exacting scrutiny." *Id.,* at 506. Despite the conclusion that classifications based on illegitimacy fall in a "realm of less than strictest scrutiny," *Lucas* also establishes that the scrutiny "is not a toothless one," *id.,* at 510, a proposition clearly demonstrated by our previous decisions in this area.[12]

### III

The Illinois Supreme Court prefaced its discussion of the state interests served by § 12 with a general discussion of

---

[12] See cases cited n. 11, *supra. Labine* v. *Vincent, supra,* is difficult to place in the pattern of this Court's equal protection decisions, and subsequent cases have limited its force as a precedent. In *Weber* v. *Aetna Casualty & Surety Co., supra,* we found in *Labine* a recognition that judicial deference is appropriate when the challenged statute involves the "substantial state interest in providing for 'the stability of . . . land titles and in the prompt and definitive determination of the valid ownership of property left by decedents' . . . ." 406 U. S., at 170, quoting *Labine* v. *Vincent,* 229 So. 2d 449, 452 (La. App. 1969). We reaffirm that view, but there is a point beyond which such deference cannot justify discrimination. Although the proposition is self-evident, *Reed* v. *Reed,* 404 U. S. 71 (1971),

the purpose of the statute. Quoting from its earlier opinions, the court concluded that the statute was enacted to ameliorate the harsh common-law rule under which an illegitimate child was *filius nullius* and incapable of inheriting from anyone. 61 Ill. 2d, at 44–45, 329 N. E. 2d, at 236–237. Although § 12 did not bring illegitimate children into parity with legitimate children, it did improve their position, thus partially achieving the asserted objective. The sufficiency of the justifications advanced for the remaining discrimination against illegitimate children must be considered in light of this motivating purpose.

## A

The Illinois Supreme Court relied in part on the State's purported interest in "the promotion of [legitimate] family relationships." 61 Ill. 2d, at 48, 329 N. E. 2d, at 238. Although the court noted that this justification had been accepted in *Labine,* the opinion contains only the most perfunctory analysis. This inattention may not have been an oversight, for § 12 bears only the most attenuated relationship to the asserted goal.[13]

---

demonstrates that state statutes involving the disposition of property at death are not immunized from equal protection scrutiny. See also *Eskra* v. *Morton,* 524 F. 2d 9, 13 (CA7 1975) (Stevens, J.). The more specific analysis of *Labine* is discussed throughout the remainder of this opinion.

[13] This purpose is not apparent from the statute. Penalizing children as a means of influencing their parents seems inconsistent with the desire of the Illinois Legislature to make the intestate succession law more just to illegitimate children. Moreover, the difference in the rights of illegitimate children in the estates of their mothers and their fathers appears to be unrelated to the purpose of promoting family relationships. In this respect the Louisiana laws at issue in *Labine* were quite different. Those laws differentiated on the basis of the character of the child's illegitimacy. "Bastard children" were given no inheritance rights. "Natural children," who could be and were acknowledged under state law, were given limited inheritance rights, but still less than those of legitimate children. 401 U. S., at 537, and n. 13. The Louisiana categories are

In a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose. No one disputes the appropriateness of Illinois' concern with the family unit, perhaps the most fundamental social institution of our society. The flaw in the analysis lies elsewhere. As we said in *Lucas,* the constitutionality of this law "depends upon the character of the discrimination and its relation to legitimate legislative aims." 427 U. S., at 504. The court below did not address the relation between § 12 and the promotion of legitimate family relationships, thus leaving the constitutional analysis incomplete. The same observation can be made about this Court's decision in *Labine,* but that case does not stand alone. In subsequent decisions, we have expressly considered and rejected the argument that a State may attempt to influence the actions of men and women by imposing sanctions on the children born of their illegitimate relationships.

In *Weber* we examined a Louisiana workmen's compensation law which discriminated against one class of illegitimate children. Without questioning Louisiana's interest in protecting legitimate family relationships, we rejected the argument that "persons will shun illicit relations because the offspring may not one day reap the benefits of workmen's compensation." 406 U. S., at 173. Although *Weber* distinguished *Labine* on other grounds, the reasons for rejecting this justification are equally applicable here:

> "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual re-

consistent with a theory of social opprobrium regarding the parents' relationships and with a measured, if misguided, attempt to deter illegitimate relationships.

sponsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." 406 U. S., at 175 (footnote omitted).

The parents have the ability to conform their conduct to societal norms, but their illegitimate children can affect neither their parents' conduct nor their own status.

## B

The Illinois Supreme Court relied on *Labine* for another and more substantial justification: the State's interest in "establish[ing] a method of property disposition." 61 Ill. 2d, at 48, 329 N. E. 2d, at 238. Here the court's analysis is more complete. Focusing specifically on the difficulty of proving paternity and the related danger of spurious claims, the court concluded that this interest explained and justified the asymmetrical statutory discrimination against the illegitimate children of intestate men. The more favorable treatment of illegitimate children claiming from their mothers' estates was justified because "proof of a lineal relationship is more readily ascertainable when dealing with maternal ancestors." *Id.*, at 52, 329 N. E. 2d, at 240. Alluding to the possibilities of abuse, the court rejected a case-by-case approach to claims based on alleged paternity. *Id.*, at 52–53, 329 N. E. 2d, at 240–241.

The more serious problems of proving paternity might justify a more demanding standard for illegitimate children claiming under their fathers' estates than that required either for illegitimate children claiming under their mothers' estates or for legitimate children generally. We think, however, that the Illinois Supreme Court gave inadequate consideration to the relation between § 12 and the State's proper objective of assuring accuracy and efficiency in the disposition of property at death. The court failed to consider the

possibility of a middle ground between the extremes of complete exclusion and case-by-case determination of paternity. For at least some significant categories of illegitimate children of intestate men, inheritance rights can be recognized without jeopardizing the orderly settlement of estates or the dependability of titles to property passing under intestacy laws. Because it excludes those categories of illegitimate children unnecessarily, § 12 is constitutionally flawed.

The orderly disposition of property at death requires an appropriate legal framework, the structuring of which is a matter particularly within the competence of the individual States. In exercising this responsibility, a State necessarily must enact laws governing both the procedure and substance of intestate succession. Absent infringement of a constitutional right, the federal courts have no role here, and, even when constitutional violations are alleged, those courts should accord substantial deference to a State's statutory scheme of inheritance.

The judicial task here is the difficult one of vindicating constitutional rights without interfering unduly with the State's primary responsibility in this area. Our previous decisions demonstrate a sensitivity to "the lurking problems with respect to proof of paternity," *Gomez* v. *Perez,* 409 U. S. 535, 538 (1973), and the need for the States to draw "arbitrary lines . . . to facilitate potentially difficult problems of proof," *Weber,* 406 U. S., at 174. "Those problems are not to be lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez, supra,* at 538. Our decision last Term in *Mathews* v. *Lucas, supra,* provides especially helpful guidance.

In *Lucas* we sustained provisions of the Social Security Act governing the eligibility for surviving children's insurance benefits. One of the statutory conditions of eligibility was dependency on the deceased wage earner. 427 U. S., at 498,

and n. 1. Although the Act presumed dependency for a number of categories of children, including some categories of illegitimate children, it required that the remaining illegitimate children prove actual dependency. The Court upheld the statutory classifications, finding them "reasonably related to the likelihood of dependency at death." *Id.*, at 509. Central to this decision was the finding that the "statute does not broadly discriminate between legitimates and illegitimates without more, but is carefully tuned to alternative considerations." *Id.*, at 513.

Although the present case arises in a context different from that in *Lucas*, the question whether the statute "is carefully tuned to alternative considerations" is equally applicable here. We conclude that § 12 does not meet this standard. Difficulties of proving paternity in some situations do not justify the total statutory disinheritance of illegitimate children whose fathers die intestate. The facts of this case graphically illustrate the constitutional defect of § 12. Sherman Gordon was found to be the father of Deta Mona in a state-court paternity action prior to his death. On the strength of that finding, he was ordered to contribute to the support of his child. That adjudication should be equally sufficient to establish Deta Mona's right to claim a child's share of Gordon's estate, for the State's interest in the accurate and efficient disposition of property at death would not be compromised in any way by allowing her claim in these circumstances.[14] The reach of the statute extends well

---

[14] Evidence of paternity may take a variety of forms, some creating more significant problems of inaccuracy and inefficiency than others. The States, of course, are free to recognize these differences in fashioning their requirements of proof. Our holding today goes only to those forms of proof which do not compromise the States' interests. This clearly would be the case, for example, where there is a prior adjudication or formal acknowledgment of paternity. Thus, we would have a different case if the state statute were carefully tailored to eliminate imprecise and unduly burdensome methods of establishing paternity.

beyond the asserted purposes. See *Jimenez* v. *Weinberger*, 417 U. S. 628, 637 (1974).

## C

The Illinois Supreme Court also noted that the decedents whose estates were involved in the consolidated appeals could have left substantial parts of their estates to their illegitimate children by writing a will. The court cited *Labine* as authority for the proposition that such a possibility is constitutionally significant. 61 Ill. 2d, at 52, 329 N. E. 2d, at 240. The penultimate paragraph of the opinion in *Labine* distinguishes that case from *Levy* v. *Louisiana*, 391 U. S. 68 (1968),[15] because no insurmountable barrier prevented the illegitimate child from sharing in her father's estate. "There is not the slightest suggestion in this case that Louisiana has barred this illegitimate from inheriting from her father." 401 U. S., at 539. The Court then listed three different steps that would have resulted in some recovery by Labine's illegitimate daughter. Labine could have left a will; he could have legitimated the daughter by marrying her mother; and he could have given the daughter the status of a legitimate child by stating in his acknowledgment of paternity his desire to legitimate her. *Ibid.* In *Weber* our distinction of *Labine* was based in part on the fact that no such alternatives existed, as state law prevented the acknowledgment of the children involved. 406 U. S., at 170-171.

Despite its appearance in two of our opinions, the focus on the presence or absence of an insurmountable barrier is somewhat of an analytical anomaly. Here, as in *Labine*, the question is the constitutionality of a state intestate succession law that treats illegitimate children differently from legitimate children. Traditional equal protection analy-

---

[15] In *Levy* the Court struck down a Louisiana wrongful-death statute that gave legitimate, but not illegitimate, children a cause of action for the wrongful death of their parents.

sis asks whether this statutory differentiation on the basis of illegitimacy is justified by the promotion of recognized state objectives. If the law cannot be sustained on this analysis, it is not clear how it can be saved by the absence of an insurmountable barrier to inheritance under other and hypothetical circumstances.

By focusing on the steps that an intestate might have taken to assure some inheritance for his illegitimate children, the analysis loses sight of the essential question: the constitutionality of discrimination against illegitimates in a state intestate succession law. If the decedent had written a will devising property to his illegitimate child, the case no longer would involve intestate succession law at all. Similarly, if the decedent had legitimated the child by marrying the child's mother or by complying with the requirements of some other method of legitimation, the case no longer would involve discrimination against illegitimates. Hard questions cannot be avoided by a hypothetical reshuffling of the facts. If Sherman Gordon had devised his estate to Deta Mona this case would not be here. Similarly, in *Reed* v. *Reed*, 404 U. S. 71 (1971), if the decedent had left a will naming an executor, the problem of the statutory preference for male administrators of estates of intestates would not have been presented. The opinion in *Reed* gives no indication that this available alternative had any constitutional significance. We think it has none in this case.

D

Finally, appellees urge us to affirm the decision below on the theory that the Illinois Probate Act, including § 12, mirrors the presumed intentions of the citizens of the State regarding the disposition of their property at death. Individualizing this theory, appellees argue that we must assume that Sherman Gordon knew the disposition of his estate under the Illinois Probate Act and that his failure to make a will shows his approval of that disposition. We need not

resolve the question whether presumed intent alone can ever justify discrimination against illegitimates,[16] for we do not think that § 12 was enacted for this purpose.. The theory of presumed intent is not relied upon in the careful opinion of the Illinois Supreme Court examining both the history and the text of § 12. This omission is not without significance, as one would expect a state supreme court to identify the state interests served by a statute of its state legislature. Our own examination of § 12 convinces us that the statutory provisions at issue were shaped by forces other than the desire of the legislature to mirror the intentions of the citizens of the State with respect to their illegitimate children.

To the extent that other policies are not considered more important, legislators enacting state intestate succession laws probably are influenced by the desire to reflect the natural affinities of decedents in the allocation of estates among the

---

[16] Appellees characterize the Illinois intestate succession law as a "statutory will." Because intent is a central ingredient in the disposition of property by will, the theory that intestate succession laws are "statutory wills" based on the "presumed intent" of the citizens of the State may have some superficial appeal. The theory proceeds from the initial premise that an individual could, if he wished, disinherit his illegitimate children in his will. Because the statute merely reflects the intent of those citizens who failed to make a will, discrimination against illegitimate children in intestate succession laws is said to be equally permissible. The term "statutory will," however, cannot blind us to the fact that intestate succession laws are acts of States, not of individuals. Under the Fourteenth Amendment this is a fundamental difference.

Even if one assumed that a majority of the citizens of the State preferred to discriminate against their illegitimate children, the sentiment hardly would be unanimous. With respect to any individual, the argument of knowledge and approval of the state law is sheer fiction. The issue therefore becomes where the burden of inertia in writing a will is to fall. At least when the disadvantaged group has been a frequent target of discrimination, as illegitimates have, we doubt that a State constitutionally may place the burden on that group by invoking the theory of "presumed intent." See *Eskra* v. *Morton*, 524 F. 2d, at 12–14 (Stevens, J.).

categories of heirs. See *Mathews v. Lucas*, 427 U. S., at 514–515. A pattern of distribution favoring brothers and sisters over cousins is, for example, best explained on this basis. The difference in § 12 between the rights of illegitimate children in the estates of their fathers and mothers, however, is more convincingly explained by the other factors mentioned by the court below. Accepting in this respect the views of the Illinois Supreme Court, we find in § 12 a primary purpose to provide a system of intestate succession more just to illegitimate children than the prior law, a purpose tempered by a secondary interest in protecting against spurious claims of paternity. In the absence of a more convincing demonstration, we will not hypothesize an additional state purpose that has been ignored by the Illinois Supreme Court.

## IV

For the reasons stated above, we conclude that § 12 of the Illinois Probate Act [17] cannot be squared with the command of the Equal Protection Clause of the Fourteenth Amendment. Accordingly, we reverse the judgment of the Illinois Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*So ordered.*

THE CHIEF JUSTICE, MR. JUSTICE STEWART, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST dissent. Like the

---

[17] The Illinois statute can be distinguished in several respects from the Louisiana statute in *Labine*. The discrimination in *Labine* took a different form, suggesting different legislative objectives. See, *e. g.*, n. 13, *supra*. In its impact on the illegitimate children excluded from their parents' estates, the statute was significantly different. Under Louisiana law, all illegitimate children, "natural" and "bastard," were entitled to support from the estate of the deceased parent. 401 U. S., at 534 n. 2. Despite these differences, it is apparent that we have examined the Illinois statute more critically than the Court examined the Louisiana statute in *Labine*. To the extent that our analysis in this case differs from that in *Labine* the more recent analysis controls.

Supreme Court of Illinois, they find this case constitutionally indistinguishable from *Labine* v. *Vincent*, 401 U. S. 532 (1971). They would, therefore, affirm the judgment.

MR. JUSTICE REHNQUIST, dissenting.

The Fourteenth Amendment's prohibition against "any State . . . deny[ing] to any person . . . the equal protection of the laws" is undoubtedly one of the majestic generalities of the Constitution. If, during the period of more than a century since its adoption, this Court had developed a consistent body of doctrine which could reasonably be said to expound the intent of those who drafted and adopted that Clause of the Amendment, there would be no cause for judicial complaint, however unwise or incapable of effective administration one might find those intentions. If, on the other hand, recognizing that those who drafted and adopted this language had rather imprecise notions about what it meant, the Court had evolved a body of doctrine which both was consistent and served some arguably useful purpose, there would likewise be little cause for great dissatisfaction with the existing state of the law.

Unfortunately, more than a century of decisions under this Clause of the Fourteenth Amendment have produced neither of these results. They have instead produced a syndrome wherein this Court seems to regard the Equal Protection Clause as a cat-o'-nine-tails to be kept in the judicial closet as a threat to legislatures which may, in the view of the judiciary, get out of hand and pass "arbitrary," "illogical," or "unreasonable" laws. Except in the area of the law in which the Framers obviously meant it to apply—classifications based on race or on national origin, the first cousin of race—the Court's decisions can fairly be described as an endless tinkering with legislative judgments, a series of conclusions unsupported by any central guiding principle.

It is too well known to warrant more than brief mention that the Framers of the Constitution adopted a system of

checks and balances conveniently lumped under the descriptive head of "federalism," whereby all power was originally presumed to reside in the people of the States who adopted the Constitution. The Constitution delegated some authority to the federal executive, some to the federal legislature, some to the federal judiciary, and reserved the remaining authority normally associated with sovereignty to the States and to the people in the States. In reaching the results that it did, the Constitutional Convention in 1787 rejected the idea that members of the federal judiciary should sit on a council of revision and veto laws which it considered unwise; the Convention also rejected a proposal which would have empowered Congress to nullify laws enacted by any of the several States.

Following the Civil War, Congress propounded and the States ratified the so-called "Civil War Amendments"—the Thirteenth, Fourteenth, and Fifteenth Amendments, which, together with post-Civil War legislation, sharply altered the balance of power between the Federal and State Governments. See *Mitchum* v. *Foster,* 407 U. S. 225, 238–242 (1972). But they were not designed to accomplish this purpose in some vague, ill-defined way which was ultimately to be discovered by this Court more than a century after their enactment. Their language contained the mechanisms by which their purpose was to be accomplished. Congress might affirmatively legislate under § 5 of the Fourteenth Amendment to carry out the purposes of that Amendment; and the courts could strike down state laws found directly to violate the dictates of any of the Amendments.

This was strong medicine, and intended to be such. But it cannot be read apart from the original understanding at Philadelphia: The Civil War Amendments did not make this Court into a council of revision, and they did not confer upon this Court any authority to nullify state laws which were merely felt to be inimical to the Court's notion of the public interest.

That much is common ground at least at the conscious level. But in providing the Court with the duty of enforcing such generalities as the Equal Protection Clause, the Framers of the Civil War Amendments placed it in the position of Adam in the Garden of Eden. As members of a tripartite institution of government which is responsible to no constituency, and which is held back only by its own sense of self-restraint, see *United States* v. *Butler,* 297 U. S. 1, 79 (1936) (Stone, J., dissenting), we are constantly subjected to the human temptation to hold that any law containing a number of imperfections denies equal protection simply because those who drafted it could have made it a fairer or a better law. The Court's opinion in the instant case is no better and no worse than the long series of cases in this line, a line which unfortunately proclaims that the Court has indeed succumbed to the temptation implicit in the Amendment.

The Equal Protection Clause is itself a classic paradox, and makes sense only in the context of a recently fought Civil War. It creates a requirement of equal treatment to be applied to the process of legislation—legislation whose very purpose is to draw lines in such a way that different people are treated differently. The problem presented is one of sorting the legislative distinctions which are acceptable from those which involve invidiously unequal treatment.

All constitutional provisions for protection of individuals involve difficult questions of line drawing. But most others have implicit within them an understandable value judgment that certain types of conduct have a favored place and are to be protected to a greater or lesser degree. Obvious examples are free speech, freedom from unreasonable search and seizure, and the right to a fair trial. The remaining judicial task in applying those guarantees is to determine whether, on given facts, the constitutional value judgment embodied in such a provision has been offended in a particular case.

In the case of equality and equal protection, the constitu-

tional principle—the thing to be protected to a greater or lesser degree—is not even identifiable from within the four corners of the Constitution. For equal protection does not mean that all persons must be treated alike. Rather, its general principle is that persons similarly situated should be treated similarly. But that statement of the rule does little to determine whether or not a question of equality is even involved in a given case. For the crux of the problem is *whether persons are similarly situated* for purposes of the state action in issue. Nothing in the words of the Fourteenth Amendment specifically addresses this question in any way.

The essential problem of the Equal Protection Clause is therefore the one of determining where the courts are to look for guidance in defining "equal" as that word is used in the Fourteenth Amendment. Since the Amendment grew out of the Civil War and the freeing of the slaves, the core prohibition was early held to be aimed at the protection of blacks. See *Strauder* v. *West Virginia,* 100 U. S. 303 (1880); Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1 (1955). If race was an invalid sorting tool where blacks were concerned, it followed logically that it should not be valid where other races were concerned either. See *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886). A logical, though not inexorable, next step, was the extension of the protection to prohibit classifications resting on national origin. See *Oyama* v. *California,* 332 U. S. 633 (1948).

The presumptive invalidity of all of these classifications has made decisions involving them, for the most part, relatively easy. But when the Court has been required to adjudicate equal protection claims not based on race or national origin, it has faced a much more difficult task. In cases involving alienage, for example, it has concluded that such classifications are "suspect" because, though not necessarily involving race or national origin, they are enough like the latter to warrant similar treatment. See *Graham* v. *Richard-*

*son,* 403 U. S. 365 (1971); *Sugarman* v. *Dougall,* 413 U. S. 634 (1973); *In re Griffiths,* 413 U. S. 717 (1973). While there may be individual disagreement as to how such classes are to be singled out and as to whether specific classes are sufficiently close to the core area of race and national origin to warrant such treatment, one cannot say that the inquiry is not germane to the meaning of the Clause.

Illegitimacy, which is involved in this case, has never been held by the Court to be a "suspect classification." Nonetheless, in several opinions of the Court, statements are found which suggest that although illegitimates are not members of a "suspect class," laws which treat them differently from those born in wedlock will receive a more far-reaching scrutiny under the Equal Protection Clause than will other laws regulating economic and social conditions. *Levy* v. *Louisiana,* 391 U. S. 68 (1968); *Glona* v. *American Guarantee & Liability Ins. Co.,* 391 U. S. 73 (1968); *Labine* v. *Vincent,* 401 U. S. 532 (1971); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974). But see *Mathews* v. *Lucas,* 427 U. S. 495 (1976). The Court's opinion today contains language to that effect. *Ante,* at 766–767. In one sense this language is a source of consolation, since it suggests that parts of the Court's analysis used in this case will not be carried over to traditional "rational basis" or "minimum scrutiny" cases. At the same time, though, it is a source of confusion, since the unanswered question remains as to the precise sort of scrutiny to which classifications based on illegitimacy will be subject.

The appropriate "scrutiny," in the eyes of the Court, appears to involve some analysis of the relation of the "purpose" of the legislature to the "means" by which it chooses to carry out that purpose. The Court's opinion abounds in language of this sort. We are told that "the sufficiency of the justifi-

cations advanced for the remaining discrimination against illegitimate children must be considered in light of this motivating purpose [discussed by the Supreme Court of Illinois]." *Ante,* at 768. The Court comments that while "[t]he Illinois Supreme Court relied in part on the State's purported interest in 'the promotion of [legitimate] family relationships,'" the statute, in the opinion of this Court, "bears only the most attenuated relationship to the asserted goal." *Ibid.* We are further told that "[t]he court below did not address the relation between § 12 and the promotion of legitimate family relationships, thus leaving the constitutional analysis incomplete." *Ante,* at 769. But large parts of the Court's opinion are devoted to its assessment of whether § 12 of the Illinois Probate Act did or did not "advance" the "purpose" which the Illinois Legislature had in mind when it passed that section. The crowning irony of the opinion is its assertion that "the judicial task here is the difficult one of vindicating constitutional rights without interfering unduly with the State's primary responsibility in this area." *Ante,* at 771.

The "difficulty" of the "judicial task" is, I suggest, a self-imposed one, stemming not from the Equal Protection Clause but from the Court's insistence on reading so much into it. I do not see how it can be doubted that the purpose (in the ordinary sense of that word) of the Illinois Legislature in enacting § 12 of the Illinois Probate Act was to make the language contained in that section a part of the Illinois law. I presume even the Court will concede that this purpose was accomplished. It was this particular language which the Illinois Legislature, by the required vote of both of its houses and the signature of the Governor, enacted into law. The use of the word "purpose" in today's opinion actually expands the normal meaning of the word into something more like motive. Indeed, the Court says that the law "must be considered in light of this motivating purpose." *Ante,* at 768. The question of what "motivated" the various individual

legislators to vote for this particular section of the Probate Act, and the Governor of Illinois to sign it, is an extremely complex and difficult one to answer even if it were relevant to the constitutional question:

> "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality." *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 265 (1977) (footnote omitted).

What the Court in this case is apparently trying to ascertain is what the legislature had in mind or was trying to accomplish by enacting § 12. And, of course, this is actually an inquiry into motive: *Why* did the legislature pass this particular law?

If the great difficulties, described in *Arlington Heights, supra,* of ascertaining what various individual legislators "had in mind" when they voted to enact § 12 of the Illinois Probate Act are surmounted, this Court then takes it upon itself to inquire into whether the Act in question accomplished the "purpose" which the Court first determines the legislature had in mind. It should be apparent that litigants who wish to succeed in invalidating a law under the Equal Protection Clause must have a certain schizophrenia if they are to be successful in their advocacy: They must first convince this Court that the legislature had a particular purpose in mind in enacting the law, and then convince it that the law was not at all suited to the accomplishment of that purpose.

But a graver defect than this in the Court's analysis is that it also requires a conscious second-guessing of legislative judgment in an area where this Court has no special expertise

whatever. Even assuming that a court has properly accomplished the difficult task of identifying the "purpose" which a statute seeks to serve, it then sits in judgment to consider the so-called "fit" between that "purpose" and the statutory means adopted to achieve it. In most cases, and all but invariably if the Court insists on singling out a unitary "purpose," the "fit" will involve a greater or lesser degree of imperfection. Then the Court asks itself: How much "imperfection" between means and ends is permissible? In making this judgment it must throw into the judicial hopper the whole range of factors which were first thrown into the legislative hopper. What alternatives were reasonably available? What reasons are there for the legislature to accomplish this "purpose" in the way it did? What obstacles stood in the way of other solutions?

The fundamental flaw, to me, in this approach is that there is absolutely nothing to be inferred from the fact that we hold judicial commissions that would enable us to answer any one of these questions better than the legislators to whose initial decision they were committed. Without any antecedent constitutional mandate, we have created on the premises of the Equal Protection Clause a school for legislators, whereby opinions of this Court are written to instruct them in a better understanding of how to accomplish their ordinary legislative tasks.

I would by no means suggest that this case is the first, and I fear it will not be the last, to import this sort of analysis into the Equal Protection Clause. As long ago as *Royster Guano Co. v. Virginia,* 253 U. S. 412, 415 (1920), the Court declared that a classification to be valid under the Equal Protection Clause "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . . ." Mr. Justice Pitney wrote the opinion of the Court in that case, and Mr. Justice Brandeis, joined by Mr. Justice Holmes, dissented. While the quotation in context is

far less objectionable than the just-quoted excerpt, it seems to me that there is little doubt that this case would be decided differently today.

The familiar quotation from *Royster Guano* comes from a time when the Court was giving a broad reading to both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to invalidate legislation in a way which, it is hoped, would not recur today. See, *e. g., Concordia Ins. Co.* v. *Illinois,* 292 U. S. 535 (1934); *Hartford Co.* v. *Harrison,* 301 U. S. 459 (1937). Every law enacted, unless it applies to all persons at all times and in all places, inevitably imposes sanctions upon some and declines to impose the same sanctions on others. But these inevitable concomitants of legislation have little or nothing to do with the Equal Protection Clause of the Fourteenth Amendment, unless they employ means of sorting people which the draftsmen of the Amendment sought to prohibit. I had thought that cases like *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961), in which the Court, speaking through Mr. Chief Justice Warren, said that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it," and *McDonald* v. *Board of Election,* 394 U. S. 802, 809 (1969), in which the Court, again speaking through Mr. Chief Justice Warren, said that "[l]egislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them," would have put to rest the expansive notions of judicial review suggested in the above-quoted excerpt from *Royster Guano.*

Here the Illinois Legislature was dealing with a problem of intestate succession of illegitimates from their fathers, which, as the Court concedes, frequently presents difficult problems of proof. The provisions of Illinois Probate Act § 12, as most recently amended, alleviate some of the difficulties which pre-

viously stood in the way of such succession. The fact that the Act in question does not alleviate all of the difficulties, or that it might have gone further than it did, is to me wholly irrelevant under the Equal Protection Clause. The circumstances which justify the distinction between illegitimates and legitimates contained in § 12 are apparent with no great exercise of imagination; they are stated in the opinion of the Court, though they are there rejected as constitutionally insufficient. Since Illinois' distinction is not mindless and patently irrational, I would affirm the judgment of the Supreme Court of Illinois.