*In re* ESTATE OF JAMES CODY, Deceased.—(METROPOLITAN LIFE INSURANCE COMPANY *et al.*, Petitioners-Appellees, *v.* BERNARD JOHNSON, Administrator of the Estate of James Cody *et al.*, Respondents-Appellants.)

First District (1st Division)    No. 79-1279

Opinion filed December 29, 1980.

Anna R. Langford and Howard T. Savage, both of Chicago, for appellants.

Peterson, Ross, Schloerb & Seidel, of Chicago (Joseph J. Hasman and Daniel A. Engel, of counsel), for appellees.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:
This is an appeal from an order of the circuit court of Cook County

finding Clifford Cody to be the illegitimate son and sole heir of James Cody, who died intestate.

The issues presented for review are: (1) whether Clifford Cody was proven by clear and convincing evidence to be the son of the decedent; and (2) whether the Illinois Statute (Ill. Rev. Stat. 1979, ch. 110½, par. 2—2) permitting an adjudication of paternity of an illegitimate after the death of the alleged father who dies intestate, denies equal protection or due process of law to collateral heirs.

Pursuant to petition, a contested hearing on heirship was held on April 10, 1979, and April 11, 1979, to determine whether Clifford Cody was the son, and therefore the sole heir, of James Cody, deceased. Two witnesses, Clifford Cody and Toula Mae Houser, testified that he was decedent's son. Respondents called two witnesses, Daisy Mae Cody and Bernard Johnson. Respondents contend that James Cody was childless throughout his lifetime.

Clifford Cody was born in Jewell, Georgia, on November 19, 1937. He lived with his natural mother, Louise Ficklin, and his maternal grandparents, Jamie and Viola Fichlin, until the age of fourteen. He then moved to Augusta, Georgia, where he lived for several months with, among other members of the decedent's family, Annie Laura Cody (decedent's mother) and Lillian Cody (decedent's sister). At the end of that time, decedent drove to Augusta in order to bring Clifford Cody back to Chicago to live with him and his wife in their apartment at 6148 South May Street. While in Augusta, he stayed for one week in the home of Annie Laura Cody. He and Clifford Cody then returned to Chicago where they and Gertrude Cody lived together for two to three years.

Daisy Mae Cody, who had married decedent's brother, testified that the reason James Cody drove to Augusta to bring Clifford Cody home with him was because of his wife's desire to have a child.

Decedent and Gertrude Cody bore no children as a result of their marriage. For 16 years of their marriage, they lived in Chicago in an apartment building at 6148 South May Street. This building was owned by Tula Mae Hauser. Decedent and Hauser had been working together at Continental Can Company since 1945. Prior to moving into the apartment building, decedent told Hauser that Clifford Cody was his son. Subsequently, decedent and Hauser became well acquainted and decedent and Gertrude Cody moved from a basement apartment to the first floor of the same apartment building. It was while living in the first floor apartment that Clifford Cody lived with them.

Hauser and Clifford Cody became friends during this period. In her testimony, Hauser characterized Clifford Cody as her errand boy. She stated that the decedent frequently referred to Clifford Cody as his son in her presence and in the presence of her husband. She further stated she

was present at a company picnic where decedent introduced Clifford Cody as his son to more than 25 people. Hauser was at all times aware that Gertrude Cody was not Clifford Cody's natural mother.

While living with decedent and his wife, Clifford Cody was often in the company of Bernard Johnson, decedent's nephew, who testified at the hearing. Clifford Cody attended Engelwood Night School while in Chicago. However, the decedent felt Clifford was keeping bad company, and neither he nor his wife were able to care for Clifford during daytime hours. Therefore, the decedent sent Clifford back to Augusta. Bernard Johnson stated that he was told by the decedent at that time that he, James Cody, was sending Clifford back down south.

For the next several years, Clifford Cody lived once again in the home of Annie Laura Cody. In 1959, he left Augusta. He lived in Virginia for two months and then moved to New York, where he has lived ever since. For a period he lived with Lillian Cody, decedent's sister, who had earlier moved to Brooklyn, New York.

From the time that Clifford left their home, he was in periodic communication with the decedent and Gertrude Cody. Also, Gertrude Cody periodically sent money to him.

James Cody died on April 14, 1978. Shortly before that date, he suffered a severe stroke. Bernard Johnson had telephoned Clifford to advise him of the stroke. Clifford then telephoned Augusta and was told by James Cody's sister, Annette, to hurry to Augusta because of the seriousness of decedent's condition. Clifford was in the process of preparing for his trip to Augusta when he received a telephone call from Bernard Johnson advising that James Cody had died.

Clifford drove with decedent's nephew, Jimmy Cody, from New York to Augusta to attend the funeral. While in Augusta, Clifford stayed in the home of Daisy Mae Cody, decedent's sister-in-law. Clifford signed pertinent papers relating to decedent's funeral. Also, Daisy Mae Cody, who was in charge of funeral arrangements, wrote in James Cody's obituary that Clifford Cody was the son of James Cody. Clifford had no input in the content or drafting of the obituary.

Clifford left Augusta shortly after James Cody's funeral. Prior to his leaving, however, Daisy Mae Cody gave him the decedent's possessions. Among these possessions was an envelope which contained, among other items, papers pertaining to a group insurance policy insuring the life of James Cody. This envelope was originally mailed to Augusta by Bernard Johnson, who had received it from Estelle Smith, Gertrude Cody's sister. Prior to James Cody's death, Clifford was unaware of the existence of the insurance policy. On June 3, 1978, Clifford paid $1,356 to People's Funeral Home to cover that balance of the expenses for James Cody's funeral which were not paid by social security.

Following the funeral, Clifford was taken by Bernard Johnson to the Chicago law offices of Mr. Hollander. There, Clifford apparently signed an affidavit of heirship which stated that James Cody was married twice, the first time to Louise Ficklin. However, Clifford denied that he intended to swear that Louise Ficklin was ever married to James Cody, and he stated that he never read the affidavit. Clifford cannot read or write.

Bernard Johnson witnessed the signing of the affidavit of heirship. At the same time, he signed various documents pertaining to his appointment as administrator of James Cody's estate. In his testimony, he stated that he did not know what he was signing and that he did not know, even after the June 9, 1978, hearing on heirship, that he was appointed administrator of James Cody's estate.

Clifford started to use Cody as his surname when he was about 13 years of age. Since that time he has always gone by the name of Cody. In 1973, five years before his father's death, Clifford legally changed his name from Ficklin to Cody in order to obtain a New York driver's license bearing his father's last name. Prior to that time, he had no need to change his name legally. Clifford claimed that in order to obtain a name change in New York, he had to have an affidavit from James Cody swearing that he was the father of Clifford Cody. He further stated that he did, in fact, receive such an affidavit from his father but that when he later requested its return, the lawyer who handled the name change in New York was unable to locate it for him.

After full hearings, the circuit court entered an order finding that Clifford Cody is the son and only heir of James Cody, deceased. Petitioners now appeal this order.

Respondents claim Clifford Cody was not proven by clear and convincing evidence to be the son of the decedent. In determining this issue, however, we must also adhere to the principle that the finding of the trial court should not be disturbed unless it is contrary to the manifest weight of the evidence. (*Estate of Larimore v. Chatterton* (1978), 64 Ill. App. 3d 470, 381 N.E.2d 76.) The Illinois Probate Act section on descent and distribution (Ill. Rev. Stat. 1979, ch. 110½, par. 2—2(h)) provides, in pertinent part, as follows:

> "If a decedent has acknowledged paternity of an illegitimate person or if during his lifetime or after his death a decedent has been adjudicated to be the father of an illegitimate person, that person is heir of his father * * *." (Ill. Rev. Stat. 1979, ch. 110½, par. 2—2(h).)

This section of the Probate Act allows an illegitimate descendent of a decedent to petition the probate court for a determination of his rights as as heir. Additionally, under this section of the Probate Act, the illegit-

imate can prove paternity by showing the decedent acknowledged the illegitimate as his child, or by introducing clear and convincing proof of paternity.

At the hearing on Clifford Cody's petition for heirship, Clifford stated that the decedent repeatedly referred to him as his son. Toula Mae Houser testified that James and his wife moved into her apartment and that James had told Toula Mae that Clifford was his son. During this time Clifford lived with James and Gertrude for two to three years. James introduced Clifford to Toula Mae and her husband as his son. Also, at a company picnic Toula Mae heard James introduce Clifford as his son to over 25 people.

Defendant's witnesses testified that James never acknowledged nor denied Clifford as his son. However, Daisy Mae Cody admitted writing an obituary with Clifford listed as decedent's sole surviving son. She also testified Clifford had nothing to do with the content of this obituary.

The respondents claim that Clifford Cody was not proven by clear and convincing evidence to be the son of the decedent because inconsistencies appear in the record with regard to such issue.

The respondents have argued that Clifford Cody's credibility has been impeached because he signed an affidavit which stated that Louise Ficklin and James Cody were married when, in fact, they were not married. However, Clifford Cody has admitted at the hearing and at his deposition that James Cody and Louise Ficklin were never married. This discrepancy is understandable considering that Clifford testified that he cannot read or write, that he did not know what he was signing at the lawyer's office and that he did not even remember signing the affidavit of heirship.

Respondents also find fault with petitioner's failure to produce the notarized letter needed to enable Clifford Cody to legally change his name. However, respondents did not consult the court file nor did they contact the attorney who handled the name change in New York. We are convinced that no inferences arise from these facts which would prevent a determination that Clifford Cody is the son of decedent.

Respondents also attack Clifford Cody's credibility as to details which relate to matters of memory and recall. Respondents claim that in his testimony Clifford Cody failed to recall: (1) the amount of the insurance proceeds; (2) the year of James Cody's death; (3) the month when James Cody was buried; (4) his age when he moved to New York; (5) the length of his residence in Chicago and Georgia; (6) the year he talked to Bernard Johnson about James Cody's illness; and (7) who had obtained money from social security. These alleged inconsistencies or discrepancies, to the extent there are any, are minor and do not go directly to the question of paternity. Such discrepancies are not unusual and go only

to the weight to be given the testimony by the trier of fact; they do not destroy the credibility of the witness. The minor variations do not compel us to find that the finding of paternity was contrary to the manifest weight of the evidence.

■■ As to the general issue of paternity, the judgment below should not be disturbed unless it is contrary to the manifest weight of the evidence. (*Estate of Lattimore*.) This is because the trial court is in the best position to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn therefrom. (*Morelli v. Battelli* (1978), 68 Ill. App. 3d 410, 386 N.E.2d 328.) The evidence submitted to the trial court sufficiently supports the finding that Clifford Cody is the son of the decedent. The trial court's finding of paternity in the instant case was a proper finding and is not contrary to the manifest weight of the evidence.

The respondents also argue that the Illinois statute (Ill. Rev. Stat. 1979, ch. 110½, par. 2—2) permitting an adjudication of paternity of an illegitimate after the death of the alleged father denies due process of law under the fourteenth amendment (U.S. Const., amend. XIV) to the estate and collateral heirs. More specifically, respondents claim due process is denied them because a defendant in a paternity action, who is alive, has a right to notice and an opportunity to deny paternity, possibly by entering into evidence conclusive proof in the form of his blood type. Whereas, where the alleged father dies without notice and the estate does not have the information with regard to his blood type, then the estate does not have that opportunity to have the decedent excluded based on his blood type. Respondents categorize this situation as unfair, arbitrary, capricious and unreasonable. In addition, respondents claim section 2—2 denies them equal protection under the fourteenth amendment (U.S. Const., amend. XIV).

Respondents cite *Trimble v. Gordon* (1977), 430 U.S. 762, 52 L. Ed. 2d 31, 97 S. Ct. 1459, for the proposition that paternity is determined when there is formal acknowledgment of paternity or an adjudication before the alleged father's death. Respondents argue that petitioner should have introduced into evidence an affidavit, signed by James Cody, affirming paternity of Clifford Cody. Respondents also cite *Lalli v. Lalli* (1978), 439 U.S. 259, 58 L. Ed. 2d 503, 99 S. Ct. 518, wherein the court recognized the propriety of a New York statute which allowed an illegitimate child to inherit from his intestate father only if a court has, during the father's lifetime, entered an order declaring paternity.

■■ We hold section 2—2 does not violate respondents' due process or equal protection rights guaranteed by the United States Constitution.

In *Trimble v. Gordon*, the United States Supreme Court considered a challenge, on equal protection grounds, of the Illinois Probate Act, which

allowed illegitimate children to inherit by intestate succession only from their mothers (although legitimate children may have inherited by intestate succession from both their mothers and fathers). In striking down the statute, the court found there was no legitimate State purpose to justify a total statutory disinheritance of illegitimate children whose fathers die intestate. The court specifically denied that difficulties in proving paternity would justify such a statutory disinheritance. In response to this decision, the Illinois legislature amended the section struck down by the court into section 2—2 (effective September 12, 1978).

In *Lalli*, the United States Supreme Court considered a challenge, on equal protection grounds, of a New York statutory provision that allowed an illegitimate child to inherit from his intestate father only if a court of competent jurisdiction had, during the father's lifetime, entered an order declaring paternity. In upholding the statute, the court held the requirement of a court order during the father's lifetime furthered a State interest in the just and orderly disposition of decedent's estate yet granted to illegitimates, in so far as practicable, rights of inheritance on a par with those enjoyed by legitimate children. The court found that the reach of the New York statute, unlike that involved in *Trimble v. Gordon*, did not exceed justifiable State interests.

*Trimble v. Gordon* and *Lalli* examined State statutes which limited illegitimates' rights to inherit, and compared the limitations with the State interests furthered thereby. Although each questioned whether equal protection was denied, neither opinion required an affidavit of parentage in order for paternity to be judicially decreed. In fact, the court in *Trimble v. Gordon* stated:

> "Evidence of paternity may take a variety of forms, some creating more significant problems of inaccuracy and inefficiency than others. The States, of course, are free to recognize these differences in fashioning their requirements of proof. * * *." (430 U.S. 762, 772 n.14, 52 L. Ed. 2d 31, 41 n.14, 97 S. Ct. 1459, 1466 n.14.)

Neither *Trimble v. Gordon* nor *Lalli* indicate any intention of the Court to limit states from allowing an illegitimate to inherit from his father, even though proof is not forthcoming until after the father's death.

The Illinois legislature, consistent with the foregoing quoted language in *Trimble v. Gordon*, has fashioned a statute (section 2—2) which permits illegitimate children to inherit from their fathers. But those seeking an adjudication of paternity at death are held to a higher standard of proof (that being clear and convincing evidence) than would otherwise be the case in a civil action. See *Morelli v. Battelli* (1979), 68 Ill. App. 3d 410, 386 N.E.2d 328; *In re Estate of Larimore v. Chatterton* (1978), 64 Ill. App. 3d 470, 381 N.E.2d 76.

Respondents argue that section 2—2, together with section 5 of the Paternity Act (Ill. Rev. Stat. 1979, ch. 40, par. 1355), violates the respondent's due process rights by permitting adjudication of paternity after the death of the alleged father without notice and an opportunity to present blood test evidence. Section 5, however, clearly requires notice to the alleged father only if he is alive. No notice can be given to someone who is not alive. Moreover, an administrator is the decedent's representative with respect to property in decedent's estate (see *Greenspahn v. Ehrlich* (1934), 277 Ill. App. 322), and the administrator of decedent's estate, in the case at bar, was notified of the heirship proceedings and even participated in them.

■■ Neither James Cody's nor the respondents' due process rights have been violated in this regard. Additionally, the fact that the administrator was allegedly unable to present evidence of the decedent's blood type does not effect the validity of section 5.

As in the issue of notice, section 5 is intended to provide the alleged father who is alive the opportunity, through notice, to present his blood type as evidence. In the event the alleged father is dead, notice to the administrator of his estate would allow the administrator to present evidence of the decedent's blood type, if it be available. Section 5 intends to do no more than what is practically possible. The respondents were given every realistic opportunity to present decedent's blood test. Therefore, neither James Cody's nor the respondents' due process rights have been violated in this regard.

The petitioner argues that respondents have waived the issues of denial of due process and equal protection because they failed to question the validity of section 2—2 at trial. Regardless of whether this court considers the waiver issue, however, the result would be the same.

For the above and foregoing reasons, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

McGLOON and O'CONNOR, JJ., concur.