## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 1998-CA-01573-SCT

*IN THE MATTER OF THE ESTATE OF ROBERT L. JOHNSON, DECEASED: ROBERT M. HARRIS AND ANNYE C. ANDERSON*

*v.*

*CLAUD L. JOHNSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/1998 |
| TRIAL JUDGE: | HON. JON M. BARNWELL |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES W. CRAIG |
| | DEBRA M. BROWN |
| | STEPHEN E. NEVAS |
| ATTORNEYS FOR APPELLEE: | JAMES WARREN KITCHENS |
| | CHARLES J. SWAYZE JR. |
| | NANCY A. OLSON |
| | JEFFREY LYNN ELLIS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED - 06/15/2000 |
| MOTION FOR REHEARING FILED: | 7/14/2000; denied 10/5/2000 & Op. Modified at Para. 17, Para. 20 deleted |
| MANDATE ISSUED: | 10/12/2000 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Robert L. Johnson ("Johnson") died intestate on August 16, 1938, in Leflore County, Mississippi, at the age of 27. Though he was an apparent indigent at the time of his death, he left behind numerous musical recordings. His musical legacy of Mississippi blues recordings has gained interest and acclaim through the decades, resulting in the concomitant growth of his estate. Naturally, his heirs are now interested in his accomplishments.

¶2. Caroline Thompson ("Thompson") was the last surviving sibling of Johnson. Thompson died testate on February 20, 1983, in Maryland. She devised her entire estate, including all rights and claims to the works of Johnson, to her grandson, Robert M. Harris, and her half-sister, Annye Anderson, in equal shares.

¶3. On June 1, 1989, fifty-one years after Johnson's death, his estate was opened in the Chancery Court of Leflore County, Mississippi. Two years later, on May 31, 1991, Johnson's estate received its first royalty

payments. The administrator, Willis Brumfield, subsequently filed a petition to determine heirship. On March 10, 1992, Claud L. Johnson ("Claud"), answered the petition, claiming to be the illegitimate son of Johnson. Claud was born on December 16, 1931.

¶4. On June 22, 1992, the chancery court dismissed Claud's claim to heirship, asserting his action was time-barred under Miss. Code Ann. § 91-1-15(d)(ii). This Court, however, reversed and remanded the case to the chancery court for a hearing on the merits of Claud's claim to heirship. *See **In re Estate of Johnson***, 705 So. 2d 819, 823 (Miss. 1996), *cert. denied*, **Harris v. Johnson**, 522 U.S. 1109, 118 S. Ct. 1037, 140 L.Ed.2d 104 (1998). On October 12-15, 1998, the chancery court conducted an evidentiary hearing to determine heirship, wherein it adjudicated Claud to be "the biological son and the sole heir at law of the decedent, Robert L. Johnson."

¶5. Aggrieved by the chancery court's decision, Robert Harris and Annye Anderson (hereafter "Appellants") timely perfected this appeal.

## STANDARD OF REVIEW

¶6. "Findings of a Chancellor will not be disturbed or set aside by this Court on appeal unless we are of the opinion the decision made by the trial court was manifestly wrong and not supported by substantial, credible evidence, or unless an erroneous legal standard was applied." ***Sarver v. Sarver***, 687 So. 2d 749, 753 (Miss. 1997). *See also* **Pittman v. Pittman**, 652 So. 2d 1105,1108 (Miss. 1995).

## DISCUSSION

### I.

### WHETHER THE CHANCERY COURT'S DECISION IS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE

¶7. An illegitimate child may inherit through a natural parent when there has been an adjudication of paternity based upon clear and convincing evidence. Miss. Code Ann. § 91-1-15(3)(c)(1994). Appellants assert that the chancery court erred in adjudicating Claud to be the biological son of Johnson. Specifically, they argue the court's decision was not supported by clear and convincing evidence. Further, appellants contend that the witness testimony was contradictory, the chancellor's decision was based on hearsay, and that no DNA evidence was presented at trial. After reviewing the record, we disagree and find the chancery court did not err by adjudicating Claud to be the biological son of Johnson.

¶8. At trial, Claud testified that he had been told from birth that Robert Johnson, the blues singer, was his father. Claud also testified that he remembers seeing Johnson at his home on two occasions and identified pictures of Johnson as the man he knew to be his father. Additionally, Claud testified that he abandoned his step-father's surname of Cain and began using the last name Johnson upon reaching adulthood, long before the estate was opened. Claud also presented his birth certificate, which had been on file with the Mississippi Bureau of Vital Statistics since 1931. It lists "R.L. Johnson, laborer" as Claud's father.

¶9. Claud's mother, Virgie Mae Cain, testified by video deposition that Robert Johnson was the father of her first born son, Claud, and that Johnson was the only man with whom she had been intimate at the time of conception. She further stated that Johnson came to see Claud after he was born. Virgie Mae's testimony was corroborated by Pearlina Strickland, her childhood friend, who testified that it was general knowledge

in the community that Johnson was Claud's father. Mack Brown, Virgie Mae's nephew, also testified at trial that he remembered seeing Johnson, Virgie Mae, and Claud together when Claud was a baby. Brown positively identified Johnson from a picture presented at trial and stated that it was general knowledge in the community that Claud was Johnson's son.

¶10. Finally, Claud offered the deposition testimony of Eula Mae Williams, another childhood friend of Virgie Mae. The eighty-year old Williams testified that she and Claud's mother were friends before, during, and after the time Virgie Mae became pregnant. Eula Mae testified that she and Virgie Mae grew up in the same crossroads community in Copiah County and, as young girls, attended community events together. They shared secrets and obviously relied upon one another for support and companionship. They were also prone to sneak out to "house parties" where they would listen to the music of various blues musicians. It was at one of these celebrations that Virgie Mae met Johnson. Contrary to Virgie Mae's assertion that no one ever saw Johnson and her engage in sexual intercourse, Eula Mae testified that she did in fact see Virgie Mae and Johnson engage in sexual intercourse in the spring prior to Claud's birth in December. The resulting courtship is best expressed by Eula Mae herself in response to pretrial questioning by attorney Victor McTeer, wherein Eula Mae described an incident where she, her boyfriend, Virgie Mae, and Johnson all went for a "walk" in the spring of 1931:

Q: All right, so you walked off the road, correct?

A: Right.

Q: And you started to kiss and do whatever people do?

A: M-hm.

Q: All right. Now, when you started that, what was Virgie and --

A: Doing the same thing we were.

Q: How do you know? You were sitting there watching them while you were -

A: We was both standing up.

Q: Oh, so both of you were standing up in the woods?

A: Sure, we was standing up out there in the woods.

***

Q: Excuse me, I haven't finished yet. Virgie and Robert, were they kissing and standing up?

A: Right.

Q: Was there ever a time when you were not looking at them?

A: Well, yes.

Q: I see. Did you at any point in time remove your clothing?

A: Well, had to.

Q: Okay. Did you observe them remove their clothing?

A: Sure.

Q: You were sitting there watching someone else do this?

A: I done told you.

Q: Well, let me, let me share something with you, because I'm really curious about this. Maybe I have a more limited experience. But you're saying to me that you were watching them make love?

A: M-hm.

Q: While you were making love?

A: M-hm.

Q: You don't think that's at all odd?

A: Say what?

Q: Have you ever done that before or since?

A: Yes.

Q: Watch other people make love?

A: Yes, I have done it before. Yes, I've done it after I married. Yes.

Q: You watched other people make love?

A: Yes, sir. Yes, sir.

Q: Other than...other than Mr. Johnson and Virgie Cain.

A: Right.

Q: Really?

A: You haven't?

Q: No. Really haven't.

A: I'm sorry for you.

Q: Well, I appreciate that. And perhaps I need the wealth of experience that you have. But share with me this. Did you actually watch them engage in the act? You actually watched that?

A: Yes.

Q: When they were engaging in the act, was your husband (her boyfriend at the time) watching, too?

A: Sure.

Q: Okay. Did they watch you?

A: Sure.

Q: And you watched them watch you?

A: Yes.

Eula Mae also testified that Virgie Mae told her she was pregnant with Johnson's baby in May of 1931, the year of Claud's birth. Moreover, Eula Mae testified as follows about a chance meeting with Johnson several years after Claud's birth:

Q: Now, ma'am, when you saw R.L. Johnson there at Shelby some years after Claud's birth, did you talk to him at all?

A: Yes, we talked about the baby.

Q: Tell us about that conversation...

A: Well, I was just asking when was he coming back down here. He said, "Well, I'm not coming back." He said, "I'm going pretty good right now." He say, "I'll be up here." He said, "She done got married now, and she got a husband and children."

¶11. The above testimony is more than sufficient to establish the credibility of the witness and to prove the facts asserted. It rings true.

¶12. The appellants also complain that no DNA evidence was presented at trial to support the chancery court's ruling. Such evidence would be nigh impossible to obtain since Johnson's grave site is unknown. As far as we know, Johnson is buried "down by the highway side, so [his] old evil spirit can get a Greyhound bus and ride."[(1)]

¶13. The chancellor had to deal with the evidence before him, not such evidence as might be available in a perfect world. Chancellor Barnwell correctly applied the clear and convincing standard to this issue, stating:

The question is, is whether or not the evidence presented by Claud Johnson is sufficiently credible, is sufficiently clear, and sufficiently convincing enough for this Court to determine whether or not he in fact is the child of Robert Johnson, the blues singer, the one whose picture we have in evidence.

As noted above, the findings of a chancellor will not be disturbed upon appeal unless the trial court's decision was manifestly wrong and not supported by substantial, credible evidence, or where an erroneous legal standard was applied. *Sarver*, 687 So. 2d at 753. In the present case, the chancellor applied the correct clear and convincing standard. Claud presented testimony and documentation which supported his assertion that Johnson was indeed his biological father. Although some of the testimony was contradictory, we realize and expect conflict, especially in a paternity suit based on a birth which occurred nearly seventy years ago. We find the chancellor's decision to be well-reasoned, rational and supported by substantial and

credible evidence. This issue is without merit.

## II.

## WHETHER THE BIRTH CERTIFICATE OF CLAUD JOHNSON WAS PROPERLY ADMITTED INTO EVIDENCE

¶14. Appellants assert that the birth certificate of Claud is not in total conformity with the rules and regulations of the Mississippi Department of Health and, therefore, should not have been admitted into evidence. In 1931, Rule 22(7) of the Mississippi Board of Health's Bureau of Vital Statistics provided that each "certificate of birth shall contain the...[f]ull name of the father, except for illegitimate children."[(2)] In the present case, the birth certificate of Claud, who was illegitimate, lists R.L. Johnson as the father, even though Rule 22(7) prohibited such disclosure at that time. Consequently, the appellants argue Claud's birth certificate should not have been admitted into evidence.

¶15. We first note that this case was tried without a jury. We deem judges capable of ignoring inadmissible evidence such as hearsay. *State ex rel. Patterson v. Sims*, 253 Miss. 458, 465, 176 So. 2d 261, 264 (1965). Additionally, we are aware that the equal protection rationale in ***Trimble v. Gordon***, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), might render the birth certificate in question fully admissible to the same extent enjoyed by children born of a lawful marriage. However, we need not reach the constitutional parameters in this opinion.

¶16. The statement in question possesses sufficient indicia of trustworthiness to merit admissibility under M.R.E. 804(b)(4)(B) and M.R.E. 803(24). M.R.E. 804(b)(4) reads as follows:

(b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(4) *Statement of Personal or Family History.* (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated; or (B) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.

¶17. Additionally, M.R.E. 803(24) provides in relevant part that:

A statement not specifically covered under any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

In the present case, Claud's grandmother, Mrs. Marilda Smith, was the declarant as outlined under M.R.E. 804(b)(4)(B). At the time she provided the information found on the certificate, Claud's grandmother had no interest in the outcome of this case. She had no motive to falsify the birth certificate because Johnson's

music did not become financially successful until many years later. Further, the information listing R. L. Johnson as the father on Claud's birth certificate went uncontested for almost 60 years and is consistent with the later testimony of Claud's mother and her childhood friends. Consequently, the information listing R. L. Johnson as Claud's father on the birth certificate possesses sufficient indicia to indicate trustworthiness. The best interest of justice is served by allowing its admissibility. Therefore, this issue is without merit.

### III.

### WHETHER THERE WAS CREDIBLE EVIDENCE AS TO THE CAUSE OF DEATH OF ROBERT L. JOHNSON

¶18. Appellants briefly assert in a footnote that the chancery court failed to "give weight to the death certificate which gave syphilis as the cause of Robert Johnson's death." Johnson died in 1938, some six years after he allegedly fathered Claud. On the back of Johnson's death certificate, the registrar handwrote that the plantation owner thought Johnson died from syphilis. Dr. Alfio Rausa, an expert in the field of public health, testified that syphilis was much more prevalent among black men in the Mississippi Delta in 1939 than in other parts of the state. Dr. Rausa also viewed a picture of Johnson and noted that Johnson's drooping eye could be a symptom of syphilis. Dr. Rausa further testified, however, that men with active syphilis still have an 85% to 90% chance of fathering a child. Dr. Rausa concluded his testimony by stating that he was unable to determine whether Johnson actually had syphilis based on the limited information available.

¶19. The chancellor addressed the syphilis issue in his opinion as follows:

> The Court does not believe that there was sufficient proof to show that Robert Johnson had syphilis, or that he was impotent at the time of conception, and that would be an incredible stretch to make that assumption, although it's a possibility. But we're not dealing with possibilities, we're dealing with what is clear and what is convincing to the Court.

This Court agrees that insufficient proof existed to show Johnson had syphilis. Dr. Rausa clearly testified Johnson could have died from a number of things and that syphilis was merely one possibility. Further, even if we assume that Johnson did have syphilis, the testimony clearly indicates that Johnson still had An 85% to 90% chance of fathering a child.

### CONCLUSION

¶20. The chancellor did not err in adjudicating Claud L. Johnson to be the biological son of Robert L. Johnson. Accordingly, the judgment of the Leflore County Chancery Court is affirmed.

¶21. **AFFIRMED.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR. McRAE, J., NOT PARTICIPATING.**

1. Robert Johnson, *Me and the Devil Blues* (1937), compiled in SAMUEL CHARTERS, ROBERT JOHNSON 76 (1973).

2. The passage of time fails to diminish this writer's pique at the condescending remarks of my brother,

Justice Banks, in *In re Estate of Johnson*, 705 So. 2d 819, 824 (Miss. 1996)(Banks, J., dissenting from denial of motion for rehearing). This writer can only respond that, despite Justice Banks's characterization of my work as "outdated and derogatory, and unbecoming," the prescient Justice Banks, subsequent to making such remarks, has often and consistently referred to children born out of wedlock as illegitimate. *See Hogan v. Buckingham*, 730 So. 2d 15, 19 (Miss. 1998).