81 P.3d 1190

**The ESTATE OF Earl Samuel ROGERS, Jr., also known as Earl S. Rogers, Jr., Deceased.**

**No. 23421.**

Supreme Court of Hawai'i.

Dec. 29, 2003.

Roger T. Dewa, Honolulu, on the briefs, for the respondents-appellants Hilda E. Rogers, Juliet R. Rogers, Oleta Merseberg.

Ann Y. Miyasaki and Miles T. Miyasaki, Honolulu, on the briefs, for the petitioner-appellee Roxann Leilani Sebala.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

On April 13, 2000, the respondents-appellants Hilda E. Rogers, Juliet R. Rogers, and Oleta Merseberg [hereinafter, collectively, "the respondents"] filed an interlocutory appeal from the order of the first circuit court, the Honorable Virginia L. Crandall presiding, denying the respondents' motion to dismiss or, in the alternative, for judgment on the pleadings and/or summary judgment [hereinafter, "motion to dismiss"]. The respondents' sole point of error on appeal is that the circuit court erred in denying their motion to dismiss, on the basis that the petition of the petitioner-appellee Roxann Leilani Sebala was not time-barred by Hawai'i Revised Statutes (HRS) § 584–6(a)(1)(b) (1993), a provision of Hawai'i's Uniform Parentage Act (UPA).[1] We agree with Sebala and hold

---

1. HRS § 584–6 provides in relevant part:
 **Determination of father and child relationship; who may bring action; when action may be brought; process, warrant, bond, etc.** (a) A *child*, or guardian ad litem of the child, the child's natural mother, whether married or unmarried at the time the child was conceived, or her personal representative or parent if the

that the term "may," as set forth in HRS § 560:2–114(a), is permissive and that, for purposes of intestate succession, a purported heir may establish his or her parent-child relationship with the decedent by any means permitted by statute, including, but not limited to, HRS chapter 584. Accordingly, we affirm the order of the circuit court, filed on April 13, 2000.

## I. BACKGROUND

On May 12, 1999, Earl Samuel Rogers, Jr. (Earl, Jr.) died intestate. On August 16, 1999, Sebala[2] filed a petition for adjudication of intestacy and appointment of personal representative [hereinafter, "the petition"], wherein she alleged that she was the natural daughter of Earl, Jr. and, therefore, an heir to his estate, pursuant to HRS § 560:2–114(b)(2) (Supp.1999), a provision of Hawai'i's Uniform Probate Code (UPC).[3] On that same date, Sebala filed an affidavit, wherein she maintained that she was the natural daughter of Earl, Jr. and that she had been adopted during her minority by her natural paternal grandparents, Hilda E. Rogers and Earl Samuel Rogers, Sr.[4] Sebala further asserted that: (1) she resided with Earl, Jr.

mother has died; or a man alleged or alleging himself to be the natural father, or his personal representative or parent if the father has died; or a presumed father as defined in section 584–4, or his personal representative or parent if the presumed father has died; or the child support enforcement agency, *may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship within the following time periods:*

(1) *If the child is the subject of an adoption proceeding,*

 (A) Within thirty days after the date of the child's birth in any case when the mother relinquishes the child for adoption during the thirty-day period; or

 (B) *Any time prior to the date of execution by the mother of a valid consent to the child's adoption, or prior to placement of the child with adoptive parents, but in no event later than three years after the child reaches the age of majority;* or

. . . .

(3) Section 584–6 shall not extend the time within which a right of inheritance or a right to a succession may be asserted beyond the time provided by law relating to distribution and closing of decedents' estates or to the determination of heirship, or otherwise. . . .

(Emphases added.)

2. The record reflects that Sebala was born on May 26, 1963 and that she was thirty-six-years old at the time of filing her petition at issue in the present matter.

3. HRS § 560:2–114 provides:

 **Parent and child relationship. (a)** Except as provided in subsections (b) and (c), *for purposes of intestate succession* by, through, or from a person, *an individual is the child of the child's natural parents, regardless of their marital status. The parent and child relationship may be established under chapter 584.*

(b) *An adopted individual is the child of the child's adopting parent or parents and not of the child's natural parents, except that:*

(1) Adoption of a child by the spouse or reciprocal beneficiary of either natural parent has no effect on:

 (A) The relationship between the child and that natural parent; or

 (B) The right of the child or a descendant of the child to inherit from or through the other natural parent; and

(2) *Adoption of a child during such child's minority by the* spouse or reciprocal beneficiary of a natural parent of the child, *by a natural grandparent,* aunt, uncle, or sibling of the child or the spouse or reciprocal beneficiary of a natural grandparent, aunt, uncle, or sibling of the child *has no effect on the relationship between the child and either natural parent, for the limited purpose of interpretation or construction of a disposition in any will, trust, or other lifetime instrument, whether executed before or after the order of adoption, and for the purposes of determining the heirs at law of a natural family member of the child.*

(c) Inheritance from or through a child by either natural parent or the parent's kindred is precluded unless that natural parent has openly treated the child as the natural parent's, and has not refused to support the child.

(d) For the purposes of this section, if a person has been adopted more than once, the term "natural parent" includes an adopting parent by an earlier adoption.

(Emphases added.)

4. The respondents-appellants Juliet R. Rogers and Oleta Merseberg are Sebala's adoptive sisters and the natural sisters of Earl, Jr. In the event that Sebala ultimately prevails in the circuit court—*i.e.,* she establishes that Earl, Jr. was her natural father—Sebala would inherit Earl, Jr.'s entire estate. On the other hand, if Sebala does not prevail in the circuit court, Hilda, as Earl, Jr.'s only surviving parent, would inherit his entire estate. Assuming that Hilda does not have a will, upon her death, the remaining portion of Earl, Jr.'s estate in addition to Hilda's

and her adoptive mother, Hilda, until the age of four, at which time Earl, Jr. married Thelma Rogers and relocated his residence; (2) since 1997, Earl, Jr. had regularly visited Sebala's minor children; (3) the family genealogy records, which had been prepared by members of the Rogers family in 1978 and 1979, identified Sebala as the daughter of Earl, Jr. and the adoptive daughter of Earl, Sr. and Hilda; and (4) Earl, Jr.'s health insurance policy denominated Sebala as an insured under the policy.

Rideau Rogers, Earl, Jr.'s brother and Sebala's adoptive brother, joined in Sebala's petition and submitted an affidavit in support thereof, wherein he maintained that Earl, Jr. had "always referred to ... [Sebala] as his daughter" and that his parents adopted Sebala because "they were [Sebala's] paternal grandparents." In addition, Caroline Muller Anae, Hilda's first cousin, filed a similar affidavit in support of Sebala's petition, wherein she asserted that Earl, Jr. "always referred to ... [Sebala] as his daughter."

On September 17, 1999, the respondents filed an objection to the appointment of Sebala as the personal representative of Earl, Jr.'s estate and to the determination of Sebala as Earl, Jr.'s sole heir at law. In substance, the respondents objected to the appointment of Sebala as the personal representative of Earl, Jr.'s estate, on the bases that: (1) Sebala had been convicted of the offense of forgery, having forged Hilda's name on a credit card application and thereafter charged approximately $6,000.00 on the credit card; (2) Sebala, without Hilda's permission, obtained the cash proceeds from Hilda's social security payments and utilized the funds for her own personal needs, which, in effect, caused several checks, written by Hilda, to be returned for insufficient funds; (3) in 1995, Sebala, without permission, used Juliet's social security number to secure several credit cards; (4) Sebala "conned Hilda out of her life savings when she was 78 years of age"; (5) Hilda had entrusted money to Sebala for the purpose of paying the utility bills for the family residence, but Sebala "devoted the money to her own purposes and did not pay the utility bills," thereby causing the water to be turned off for nonpayment; (6) several family members considered Sebala to be "a thief and a chronic liar," based, *inter alia*, on the fact that Sebala, at one time, had "faked a pregnancy, claiming to be pregnant with twins, and later committing herself to the Queen's Psychiatric Ward as a result."

The respondents further objected to the determination of Sebala as Earl, Jr.'s sole heir at law. The respondents maintained that Hilda was Earl, Jr.'s sole heir and, assuming *arguendo*, that Sebala was Earl, Jr.'s natural daughter, the adoption of Sebala by Hilda and Earl, Sr. on October 21, 1965 "cut off all her rights of inheritance from or through Earl, Jr." Consequently, the respondents contended that Sebala was Hilda's heir along with her adoptive brother and sisters. Finally, the respondents asserted that Earl, Jr. was not Sebala's natural father in light of the following allegations: (1) no legal documentation supported a conclusion that Sebala was Earl, Jr.'s natural daughter; (2) Sebala never initiated a paternity suit, requesting that Earl, Jr. be declared her natural father; (3) Sebala's mother, Sheila Annette Kaeo, never married Earl, Jr.; (4) Kaeo had been arrested for prostitution while she was living with Earl, Jr.; (5) the "only birth certificate of [Sebala] in hand does *not* identify Earl, Jr. as her father; rather it identifies Earl, Sr. as her father and Hilda (not [Kaeo]) as her mother"; (6) the "adoption decree did not identify Earl, Jr. as the natural father or 'sole legal parent' [of Sebala] and his consent was never required as part of the adoption procedure"; (7) Earl, Jr. "never acknowledged [Sebala] as his daughter and never took her anywhere"; and (8) "Earl, Jr. never attended any special occasions such as birthdays, Christmas, or Easter ... [and] did not even know the date of or acknowledge [Sebala's] birthday...." (Emphasis in original.)

On October 19, 1999, Sebala filed an amended petition for adjudication of intesta-

---

estate would pass to Sebala, Juliet, Oleta, and Rideau in equal shares. *See* HRS § 560:2–103 (Supp.2002) ("[T]he entire intestate estate if

there is no surviving spouse ... passes ... [t]o the decedent's descendants by representation[.]").

cy and appointment of personal representative, wherein she averred that Earl, Jr. was her "presumed father," pursuant to HRS §§ 560:2–114(a), *see supra* note 3, and 584–4(a)(4) (Supp.1999),[5] inasmuch as (1) during her minority, Sebala resided with Earl, Jr. and her adoptive parents and (2) Earl, Jr. "openly held her out as his natural child." On November 1, 1999, the respondents filed an objection to Sebala's amended petition, wherein they asserted, *inter alia,* the following objections in addition to the objections set forth in their first objection: (1) Sebala's claim that Earl, Jr. was her biological father was time-barred by HRS § 584–6(a)(1)(B), insofar as Sebala failed to file a paternity action under HRS chapter 584 within three years of reaching the age of majority; and (2) Sebala's claim that Earl, Jr. was her "presumed father" pursuant to HRS § 584–4(a)(4) was "barred by her failure to bring any proceeding under the [UPA], HRS Chapter 584, during Earl, Jr.'s lifetime...." Following a hearing on the foregoing matter, Judge Kevin S.C. Chang transferred the case to the civil trial calendar for all purposes before Judge Virginia L. Crandall.

On January 11, 2000, the respondents filed their motion to dismiss at issue in the present matter, wherein they argued that the UPA's statute of limitations, as set forth in HRS § 584–6(a)(1)(B), *see supra* note 1, applied to a probate proceeding brought pursuant HRS § 560:2–114(a), *see supra* note 3, thereby barring Sebala's petition. The respondents contended that, assuming Sebala is, in fact, Earl, Jr.'s natural daughter, she nevertheless failed to "establish" her parent-child relationship with Earl, Jr. in the manner or within the time period prescribed by HRS § 560:2–114(a), *see supra* note 3, which, as interpreted by the respondents, requires that paternity be established pursuant to

HRS § 584–6(a). In particular, the respondents asserted that HRS § 584–6(a) mandated that Sebala establish her parent-child relationship with Earl, Jr. within three years after she reached the age of majority, which, for purposes of the present matter, was May 26, 1981.

On March 1, 2000, Sebala filed a memorandum in opposition to the respondent's motion to dismiss. Sebala countered that, pursuant to HRS § 560:2–114(a), *see supra* note 3, as the natural daughter of Earl, Jr., she was an heir for purposes of intestate succession. Moreover, Sebala argued that, pursuant to HRS § 560:2–114(b)(2), *see supra* note 3, the adoption during her minority by her paternal grandparents had "no effect on the relationship between [Sebala] and her natural father ... for purposes of determining heirs at law" and that the commentary to HRS § 560:2–114 and the standing committee reports relating to Hawai'i's adoption of the UPC support the foregoing interpretation "by treating adoptions by ... [natural grandparents] differently from traditional adoptions," which terminate a child's right to inherit from his or her natural parents upon the execution of an adoption.

With respect to the respondents' statute of limitations argument, Sebala maintained that "[t]he reference in H.R.S. Section 560:2–114 to chapter 584 should not limit a child's right to take as an heir at law of his or her natural parents. Such an interpretation would defeat the purpose of the 'Ohana [6] Adoption Statute under H.R.S. Section 560:2–114(b) which is unique and special to the State of Hawai'i." In particular, Sebala contends that the express language of HRS § 560:2–114, namely the use of the word "may," reflects that the UPC does not require that the par-

---

5. HRS § 584–4 provides in relevant part:

> **Presumption of paternity.** (a) A man is presumed to be the natural father of a child if:
> ....
> (4) While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child;
> ....
> (b) A presumption under this section may be rebutted in an appropriate action only by clear

and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man.

6. "'Ohana" means "[f]amily, relative, kin group; related." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 276 (Rev. Ed.1986).

ent-child relationship be established pursuant to HRS chapter 584.

On March 9, 2000, the circuit court conducted a hearing on the matter and thereafter took the matter under advisement. On April 13, 2000, the circuit court filed an order denying the respondents' motion to dismiss, wherein the circuit court stated in relevant part:

2. H.R.S. Section 560:2–114(b)(2) states in pertinent part: "An adoption of a child during such child's minority . . . by a natural grandparent . . . has no effect on the relationship between the child and either natural parent . . . for the purposes of determining the heirs at law of a natural family member of the child." If [Sebala] is the natural child of [Earl, Jr.], then the adoption of [Sebala] by her paternal grandparents has no effect on [Sebala's] relationship with [Earl, Jr.] for purposes of determining the heirs of [Earl, Jr.]. If [Sebala] is the natural child of [Earl, Jr.], [Sebala] comes within the definition and intent of the 'ohana adoption statute. The legislative history of H.R.S. Section 560:2–114(b)(2) states that the intent of the 'ohana adoption statute is to support "the Hawaiian tradition of extended in-family adoptions with no intention that such adoptions legally sever the inheritance relationship from and through the natural parent, either in cases of intestacy or in testamentary documents."

3. With regard to [the respondents'] arguments as to the statute of limitations under the Uniform Parentage Act, there is no Hawai'i case law addressing this issue. Consistent with the legislative intent of the 'ohana adoption statutes, though[ ], would be the analysis of the concurring opinion of the court in *[In re] Estate of Sorensen*, 411 N.W.2d 362 (N.D.1987), that the statute of limitations for a paternity action to determine child support issues should not apply

in determining the natural parent under the Probate Code for inheritance purposes.

On April 12, 2000, the respondents filed a motion for Hawai'i Rules of Appellate Procedure (HRAP) Rule 54(b) certification or, in the alternative, for leave to take interlocutory appeal and for a stay pending appeal [hereinafter, "motion for interlocutory appeal"].[7] On May 1, 2000, the circuit court filed an order denying the respondents' request for HRAP Rule 54(b) certification and granting the respondents' motion for an interlocutory appeal and for a stay pending appeal, finding that "interlocutory appeal is advisable because resolution of the legal issues (the application of the 'ohana statute to the facts of this case and the application of the statute of limitations) will result in the speedy termination of this litigation."[8] On May 3, 2000, the respondents filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Motion To Dismiss

 It is well settled that:

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. *Ravelo v. County of Hawai'i,* 66 Haw. 194, 198, 658 P.2d 883, 886 (1983) (quoting *Midkiff [v. Castle & Cooke, Inc.],* 45 Haw. [409,] 414, 368 P.2d [887,] 890 [ (1962) ] ); *Marsland v. Pang,* 5 Haw.App. 463, 474, 701 P.2d 175, 185–86, *cert. denied,* 67 Haw. 686, 744 P.2d 781 (1985). We must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. *Ravelo,* 66 Haw. at 199, 658 P.2d at 886. For this reason,

---

7. It appears from Sebala's opening brief that, on March 30, 2000, the circuit court denied the respondents' motion to dismiss by way of a minute order, from which the respondents filed their motion for interlocutory appeal. Consequently, the respondents filed the foregoing motion prior to the circuit court's filing of its written order, on April 13, 2000, denying the motion to dismiss.

8. In their opening brief, the respondents expressly withdraw their contention that the adoption of Sebala by Earl, Sr. and Hilda, in effect, severed Sebala's right to inherit from her natural father. That being the case, the sole issue on appeal is whether Sebala's heirship petition is barred by HRS § 584–6(a)(1)(B).

in reviewing [a] circuit court's order dismissing [a] complaint ... our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true. *Au [v. Au],* 63 Haw. [210,] 214, 626 P.2d [173,] 177 (1981).

*Baehr v. Lewin,* 74 Haw. 530, 545, 852 P.2d 44, 52, *reconsideration granted in part and denied in part,* 74 Haw. 650, 875 P.2d 225 (1993).

*Blair v. Ing,* 95 Hawai'i 247, 252, 21 P.3d 452, 457 (2001) (quoting *Touchette v. Ganal,* 82 Hawai'i 293, 297–98, 922 P.2d 347, 351–52 (1996) (brackets and ellipsis in the original)).

B. *Statutory interpretation*

■■■ We review the circuit court's interpretation of a statute *de novo. State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

... This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature

to enact it ... to discover its true meaning." HRS § 1–15(2) (1993).

*Id.* at 94–95, 26 P.3d at 583–84 (some citations and internal quotation marks added and some in original) (brackets in original).

*Troyer v. Adams,* 102 Hawai'i 399, 409, 77 P.3d 83, 93 (2003) (quoting *Coon v. City and County of Honolulu,* 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002)).

III. *DISCUSSION*

■ As a matter of first impression, the respondents argue that section 584-6(a) of the UPA,[9] *see supra* note 1, which prescribes the statute of limitations period for paternity actions, renders Sebala's heirship claim brought pursuant to section 560:2–114 of the UPC,[10] *see supra* note 3, time-barred and, consequently, that the circuit court erred in denying their motion to dismiss on the foregoing basis. In particular, the respondents assert that the term "may," as set forth in HRS § 560:2–114(a), with respect to establishing a parent-child relationship for purposes of intestate succession is mandatory, not permissive, and, therefore, that HRS § 584-6(a) provides the exclusive means by which to bring an action to establish paternity. The respondents contend that, pursuant to HRS § 584-6(a), in order to maintain her claim of heirship, Sebala had to establish her parent-child relationship with Earl, Jr. "within three years after [she] reache[d] the age of majority," which was May 26, 1984, and that her failure to do so renders her petition in the present matter time-barred.

The respondents further argue that the circuit court's reliance on HRS § 560:2–114(b), *see supra* note 3, Hawai'i's 'ohana statute, was misplaced, insofar as HRS § 560:2–114(b) is inapposite to whether Sebala's petition is time-barred by HRS § 584-6(a), *see supra* note 1. The respondents concede that, if Sebala had established that she was, in fact, Earl, Jr.'s natural daughter within the time period mandated by HRS 584-6(a), she would have fallen within the

9. Hawai'i adopted the Uniform Parentage Act in 1975. *See* 1975 Haw. Sess. L. Act 66, § 1 at 115.

10. Hawai'i adopted the Uniform Probate Code in 1976. *See* 1976 Haw. Sess. L. Act 200, § 1 at 372.

protections afforded by the 'ohana statute, thereby inheriting Earl, Jr.'s entire estate as his sole heir. The respondents maintain, however, that "[t]he 'ohana amendments in 1992 did not purport to take an 'ohana case out of the UPA, or lessen the need to establish parentage under the UPA, or waive any time-bars and limitations periods contained in the UPA." Consequently, the respondents assert that the circuit court should have granted its motion to dismiss, on the basis that Sebala's petition was barred by HRS § 584–6(a), *see supra* note 1.

Sebala counters that "[n]o where [sic] in the [UPA] does it state that chapter 584 provides the exclusive means through which parentage may be determined" and that, therefore, the term "may" as set forth in HRS § 560:2–114(a), by its plain language, is permissive. Sebala asserts that interpreting the term "may" as "shall" would yield an absurd result by denying "any child that failed to establish a parent and child relationship under chapter 584 the right to inherit from their natural father.... Such a reading expects children under the age of 21 to bring parentage proceedings for the sole purpose of preserving the possibility of inheriting from their natural father sometime in the future." In addition, Sebala contends that the UPA does not expressly refer to the 'ohana statute with respect to establishing a parent-child relationship for purposes of inheritance. In that connection, Sebala argues that the 'ohana statute, as set forth in HRS § 560:2–114(b)(2), *see supra* note 3, prescribes a "new parent and child relationship that is only recognized for probate purposes," and, assuming Sebala can establish that Earl, Jr. was her natural father, she is an heir with the meaning of the UPC. Sebala maintains that to construe HRS § 560:2–114 otherwise would defeat the purpose of the 'ohana statute by "requir[ing] [Sebala] to disestablish the parent and child relationship with [Earl, Sr.] before [she] could establish the parent and child relationship with [Earl, Jr.]."

We agree with Sebala and hold that the term "may," as set forth in HRS § 560:2–114(a), is permissive and that, for purposes of intestate succession, a purported heir may establish his or her parent-child relationship with the decedent by any means permitted by statute, including, but not limited to, HRS chapter 584.

█ It is well settled that an illegitimate child has a constitutional right to inherit from his or her father. *Trimble v. Gordon*, 430 U.S. 762, 772, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). HRS § 560:2–114(a), *see supra* note 3, Hawai'i's UPC section pertaining to the "parent and child relationship" for purposes of intestate succession, provides in relevant part that "an individual is the child of the child's natural parents, regardless of their marital status." HRS § 560:2–114(a) further provides that "[t]he parent and child relationship *may* be established under chapter 584[,]" Hawai'i's UPA. (Emphasis added.) As the respondents correctly note in their opening brief, the legislative history is silent as to the intended meaning of the term "may" as set forth in HRS § 560:2–114(a).

█ In *Doe v. Doe*, 99 Hawai'i 1, 5, 52 P.3d 255, 259 (2002), however, this court had the occasion to interpret the term "may" as set forth in HRS § 584–3 and noted the following:

> chapter 584 provides a vehicle by which paternity *may* be established. By their plain language, HRS §§ 584–1 and 584–3 do *not* state that chapter 584 is the exclusive means by which paternity must be established. Accordingly, *chapter 584 is not the exclusive means by which a determination of paternity can be made.*

(Some emphasis added and some in original.) Moreover, the circuit court has jurisdiction to exercise all incidental powers necessary for the effective adjudication of matters within its exclusive original jurisdiction, which, intuitively, includes the determination of paternity for purposes of a probate matter before it. *See* HRS § 560:1–302 (Supp.1999) ("[T]he court has jurisdiction over all subject matter relating to ... [e]states of decedents, including ... determination of heirs and successors of decedents [and] ... full power to make orders, judgments and decrees and take all other action necessary and proper to administer justice in the matters which come before it."). That being the case, we believe that the term "may," as set forth in HRS

§ 560:2–114(a), *see supra* note 3, is permissive, and not mandatory, and, thus, that HRS § 584–6 is not the exclusive means by which to establish paternity for purposes of intestate succession.

Furthermore, several jurisdictions that have adopted both the UPC and the UPA and that have statutes similar, if not identical, to HRS § 560:2–114(a) have held, consistent with *Doe*, that the UPA is not the exclusive means by which to establish paternity for purposes of probate. *See Lewis v. Schneider*, 890 P.2d 148, 150–51 (Colo.Ct. App.1994) (holding that the statute of limitations contained in the UPA did not preclude the petitioner from establishing paternity under Colorado's probate code); *Ellis v. Ellis*, 752 S.W.2d 781, 782 (Ky.1988) (affirming the holding of the Kentucky Court of Appeals that Kentucky's Uniform Act on Paternity (UAP) " 'bears no relationship to the laws governing intestate succession,' " including statute of limitations, in cases "where no action has been brought under the [UAP]"); *In re Estate of Palmer*, 658 N.W.2d 197, 199 (Minn.2003) (holding that "[t]he word 'may' is permissive" and that, "[h]ad the legislature wanted parentage for probate purposes to be determined exclusively under the Parentage Act, it could have so provided"); *In re Nocita*, 914 S.W.2d 358, 359 (Mo.1996) ("Because the legislature passed the Parentage Act without conforming the Probate Code, the General Assembly refused to make the Parentage Act the exclusive means to establish paternity for probate."); *Wingate v. Estate of Ryan*, 149 N.J. 227, 693 A.2d 457, 459 (1997) (holding "that the limitations period under the Parentage Act does not apply to claims filed under the Probate Code"); *In re Estate of Greenwood*, 402 Pa.Super. 536, 587 A.2d 749, 752, 757 (1991) (holding that "the 'right to inherit' in the case of intestacy is reserved exclusively to" the probate code and that there is "no reason to look solely to the support statute in evaluating the right of an illegitimate to inherit by intestate succession, nor the statute of limitations contained therein for doing so"); *Taylor v. Hoffman*, 209 W.Va. 172, 544 S.E.2d 387, 395 (2001) ("Limitations provisions included within the paternity statute are inapplicable to a civil action by a child born out of wedlock seeking to inherit from his or her father....").

 In *Wingate*, a thirty-one-year-old plaintiff filed a complaint pursuant to the New Jersey Probate Code (NJPC) to establish that she and her son were heirs of the decedent.[11] 693 A.2d at 458. The administratrix of the decedent's estate filed a motion for summary judgment to dismiss the plaintiff's complaint as time-barred pursuant to a provision of the New Jersey Parentage Act (NJPA), which required paternity claims to be filed by the claimant's twenty-third birthday; the trial court denied the motion. *Id.* at 458–459. On appeal, the New Jersey Superior Court, Appellate Division, reversed the trial court's order, holding that the statute of limitations in the NJPA applied to the plaintiff's intestacy action to establish paternity and heirship. *Id.* at 459. The New Jersey Supreme Court reversed the Appellate Division's decision, grounding its holding in the contrasting policies underlying the NJPA and the NJPC:

> [T]he Parentage Act and the Probate Code are independent statutes designed to address different primary rights. The purpose of the Parentage Act is to establish "the legal relationship ... between a child and the child's natural or adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations." [12] Child support is the ma-

11. N.J.S.A. § 3B:5–10 (1991) provided:

> If, for the purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person, in cases not covered by N.J.S. 3B:5–9, [for adoption], a person is the child of the person's parents regardless of the marital state of the person's parents, and *the parent and child relationship may be established as provided by the "New Jersey Parentage Act,"* P.L.1983, c. 17 (C. 9:17–38 et seq.).

(Emphasis added.) In 1997, the New Jersey legislature amended N.J.S.A. § 3B:5–10 by adding the following language: "The parent and child relationship *may* be established for purposes of this section regardless of the time limitations set forth in [the New Jersey Parentage Act]." (Emphasis added.)

12. Likewise, "[t]he fundamental purposes of chapter 584 are 'to provide substantive legal equality for all children regardless of the marital status of their parents' and to protect the rights

jor concern under the Parentage Act. The purpose of the Probate Code, on the other hand, is to determine the devolution of a decedent's real and personal property. The different purposes the two statutes serve, help explain why the Legislature contemplated different periods of limitations for filing claims under those statutes.

. . . .

In contrast to children who filed support claims, which accrue on the date of birth, *potential* heirs have no right to share in an estate until the death of the decedent. By definition under the Probate Code, heirs are "those persons . . . who are entitled under the statutes of intestate succession to the property of a decedent." Applying [the Parentage Act] to actions under the Probate Code would create a statute of repose that commences on the birth of a potential heir, rather than a statute of limitations running from the decedent's death. Indeed, the Parentage Act provides that it does not affect the time within which an heirship claim must be filed.[13] That section provides further evidence that claims under the Probate Code and Parentage Act are subject to independent limitations periods. To hold otherwise would grant heirship immunity to parents of children who are born out of wedlock and do not establish parentage before reaching age twenty-three. That would terminate

and ensure the obligations of parents of children born out of wedlock." *Doe*, 99 Hawai'i at 7, 52 P.3d at 261 (quoting Stand. Comm. Rep. No. 190, in 1975 House Journal, at 1019).

13. Similarly, HRS § 584–6(a)(3), *supra* note 1, provides that "[s]ection 584–6 shall not extend the time within which a right of inheritance or a right to a succession may be asserted beyond the time provided by law relating to distribution and closing of decedents' estates or to the determination of heirship, or otherwise."

14. The authority cited by the respondents in their opening brief is factually and/or legally distinguishable from the present matter. In particular, the respondents cite to several cases from foreign jurisdictions for the proposition that the term "may," as set forth in HRS § 560:2–114(a), is mandatory. None of the cited authority, however, involved a probate proceeding; rather, the case law addressed child support and custody matters and, therefore, is inapposite. With respect to the respondents' reliance on *Estate of*

many claims before they accrue. To allow that to occur would be contrary to the Legislature's recognition in 1991 that "a person is the child of the person's parents regardless of the marital state of the person's parents."

*Id.* at 463–64 (citations omitted) (emphasis in original); *see also Palmer*, 658 N.W.2d at 200 ("The distinct purposes of probate and family law justify the legislature's decision not to make the Parentage Act the sole means of establishing paternity for the purposes of probate."); *Taylor*, 544 S.E.2d at 391 ("An examination of the evolution of the right of a child born out of wedlock to inherit from his or her parents . . . derives not from the paternity statutes, but rather from relevant court decisions and the inheritance statutes.").[14]

In light of the foregoing analysis, we believe that Sebala's petition was not time-barred by HRS § 584–6(a), insofar as HRS § 560:2–114(a) did not mandate that Sebala bring her probate action within the statute of limitations prescribed by HRS § 584–6.[15] Sebala, however, must establish her parent-child relationship with Earl, Jr. in order to inherit by intestate succession, pursuant to HRS § 560:2–103, *see supra* note 4. Accordingly, the circuit court did not err in denying the respondents' motion to dismiss.

*Sanders*, 2 Cal.App.4th 462, 3 Cal.Rptr.2d 536 (1992), we believe that the language of the California probate statute at issue in *Sanders* differs materially from HRS § 560:2–114(a) and, consequently, is unhelpful to the respondents.

15. Although we agree with Sebala that interpreting the term "may" as mandatory would frustrate the purpose of the 'ohana statute, the 'ohana statute, in and of itself, is not critical to the analysis herein, inasmuch as the plain language of HRS § 560:2–114(a) and the related case law dictate the disposition of the present matter. Accordingly, we do not address the arguments raised by Sebala with respect to the 'ohana statute.

Moreover, the case law cited above provides far more support for the proposition that HRS § 584–6 is not the exclusive means by which to establish paternity for purposes of intestate succession than the concurring opinion in *In re Estate of Sorensen*, 411 N.W.2d 362 (N.D.1987), upon which the circuit court relied in its written order denying the respondents' motion.

285

## IV. CONCLUSION

In light of the foregoing, we affirm the circuit court's order, filed on April 13, 2000, denying the respondents' motion to dismiss.