**ESTATE OF Adolph L. MARTIGNACCO.**

No. A04–814.

Court of Appeals of Minnesota.

Nov. 23, 2004.

Petition for Review Denied Jan. 26, 2005.

John W. Lang, Nicholas J. Eugster, Messerli & Kramer, P.A., Minneapolis, MN; and Richard D. Hawke, Richard D. Hawke & Associates, St. Paul, MN, for appellant Rudolf Martignacco.

John H. Daniels, Jr., Willeke & Daniels, Minneapolis, MN; and Todd D. Andrews, Andrews Law Office, Edina, MN, for respondent Robert Reed.

Considered and decided by
HALBROOKS, Presiding Judge,
ROBERT H. SCHUMACHER, Judge,
and PARKER, Judge.*

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HALBROOKS, Judge.

Appellant Rudolph Martignacco, brother of decedent Adolph Martignacco and former personal representative of decedent's estate, challenges the district court's grant of summary judgment in favor of respondent Robert Reed, the biological son of decedent, based on the district court's ruling that respondent was decedent's sole heir as a matter of law. Appellant argues that (1) respondent's claim is time-barred by the Parentage Act's statute of limitations; (2) respondent does not meet his burden of "clear and convincing" proof in establishing paternity; and (3) as a matter of public policy, genetic or blood testing should not be dispositive of whether a parent-child relationship exists. Appellant also challenges three prior rulings of the district court, arguing that it abused its discretion by (1) admitting preliminary genetic-testing results; (2) removing appellant and appointing respondent as personal representative of decedent's estate; and (3) denying appellant certain attorney fees incurred in defense of the estate. Because we conclude that the district court did not err in applying the probate code to establish parentage for purposes of intestate succession and did not otherwise abuse its discretion as to the other rulings, we affirm.

## FACTS

The material facts in this case are undisputed. Respondent's birth certificate recites that his father is Harold Reed and his mother is Lucille Reed. Harold and Lucille were married at the time of respondent's birth and raised respondent throughout his childhood. Throughout most of respondent's life he believed that Harold Reed was his father; Harold Reed similarly believed that respondent was his son. It was not until 1989, after Harold's death, that respondent first learned from his mother that decedent Adolph Martignacco was actually his biological father. Respondent subsequently met decedent, and the district court found that they "develop[ed] a relationship, [and] spen[t] time together." The extent of their relationship remains disputed. While decedent acknowledged his relationship with respondent, he chose not to introduce his son to his family members. In fact, to almost everyone in decedent's life (including his own estate-planning attorney), respondent's very existence came as a complete surprise. Respondent's mother, Lucille, submitted an affidavit that explained that her son was conceived as a result of an extramarital affair with the decedent while she was married to Harold. She stated that decedent's name was not placed on respondent's birth certificate in order to avoid embarrassment and humiliation. In addition, Lucille explained that the truth surrounding respondent's parentage was limited to "a small group of people" and that "[n]one of [decedent's] brothers were told of [respondent's] birth and its circumstances."

Decedent died intestate in 2002. During his lifetime he had never married, nor sired any children other than respondent. At the time of his death, it was generally believed that decedent was survived only by his three brothers, who expected to inherit decedent's estate. These assumptions changed when respondent attended decedent's funeral.

Soon thereafter, appellant ˙ initiated intestate probate proceedings and filed a petition for formal adjudication of intestacy, determination of heirs, and appointment of personal representative. Respondent subsequently filed his objection to the petition and asserted that he was the son of decedent and decedent's sole surviving heir. The district court then appointed appellant as personal representative of de-

cedent's estate and otherwise found that decedent's heirs were "not determined at this time." Respondent filed a petition to determine paternity under Minn.Stat. § 524.2–114(2) (2002) of the probate code, seeking to become an heir to decedent's estate and requesting disinterment of decedent for purposes of conducting genetic testing pursuant to Minn.Stat. § 149A.96 (2002). Respondent submitted an envelope—allegedly handled by decedent—to a testing lab at Orchid GeneScreen for preliminary genetic testing. Both parties were made aware of the genetic-test results, which proved decedent's paternity to a 99.99% degree of certainty.

Thereafter, the district court (1) removed appellant as personal representative of decedent's estate; (2) appointed respondent as personal representative of decedent's estate; and (3) ordered the exhumation of decedent's body for the purposes of further DNA genetic testing. The district court's order was appealed to this court, which denied discretionary review of that portion of the appeal pertaining to exhumation of decedent. *Estate of Adolph L. Martignacco,* Nos. A03–840, A03–841 (Minn.App. July 14, 2003) (order). The issue of appellant's removal as personal representative was permitted as a matter of right, but specifically reserved by appellant for appeal at this later date.

In accordance with the district court's order, decedent's body was exhumed and genetic testing was performed. Based on those conclusive test results, the parties subsequently stipulated—and the district court found—that respondent is, in fact, the biological child of the decedent.

Before summary-judgment motions were filed with the district court and while the parties were awaiting results of the conclusive genetic testing, the district court considered appellant's motion for interim attorney fees in defending dece-

dent's estate. It granted in part and denied in part appellant's motion for fees, reasoning that "it [was] fair, reasonable, and equitable that the attorneys for [appellant], as [p]ersonal [r]epresentative, be compensated for their services from the inception of the case through May 7, 2003." The district court specifically denied fees after May 7, the date that appellant's counsel was given a copy of the preliminary genetic-test report concluding that respondent was decedent's biological son, because appellant ignored "the existence of credible evidence that [respondent] was the son and an heir of [decedent]."

The parties filed cross motions for summary judgment as to whether respondent was decedent's sole heir. Relying primarily on *In re Estate of Palmer,* 658 N.W.2d 197 (Minn.2003), the district court granted respondent's motion for summary judgment and determined that respondent was the decedent's sole heir. This appeal follows.

## ISSUES

1. Did the district court err in granting summary judgment to respondent?

2. Did the district court abuse its discretion by admitting preliminary DNA evidence?

3. Did the district court abuse its discretion by sua sponte removing appellant and appointing respondent as personal representative of decedent's estate?

4. Did the district court abuse its discretion by denying certain attorney fees to appellant?

## ANALYSIS

### I.

On appeal from summary judgment, appellate courts ask: (1) whether any genuine issues of material fact exist and (2)

whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Since there are no genuine issues of material fact, the only remaining issue for this court is whether the district court erred in its application of the law when it granted summary judgment to respondent.

## A. The Parentage Act and the Probate Code

■ The threshold issue raised by appellant revolves around the applicability of the Parentage Act statute of limitations to these proceedings. That statute dictates that a claim to establish a parent-child relationship is barred if brought more than one year after a child reaches the age of majority. Minn.Stat. § 257.58 (2002). Appellant argues that the district court erred in its application of the law by determining that respondent was the sole heir of decedent when it failed to apply the time limitations of the Parentage Act, as permitted—but not required—by the supreme court's recent decision, *In re Estate of Palmer,* 658 N.W.2d 197 (Minn.2003). Appellant asserts that, while it was not appropriate to use the time limitations of the Parentage Act in *Palmer,* this case is factually distinguishable from *Palmer* because of the existence of a presumed father, Harold Reed. As a result, he argues, the statute of limitations of the Parentage Act should govern. We disagree.

In this case, the district court applied Minn.Stat. § 524.2–114 (2002) of the probate code to establish parentage for purposes of intestate succession and determined that respondent met the "clear and convincing" evidence standard set out in *Palmer,* 658 N.W.2d at 197. The district court was guided by the supreme court's decision in *Palmer,* which "specifically held that Minnesota law does not require that parentage be established by the Parentage Act ... for purposes of intestate succession." The district court concluded, "[i]f [respondent] is properly considered an heir of [decedent], then he, as the sole surviving son, is the sole heir and taker of [decedent's] [e]state pursuant to [the probate code]." In making its determination, the court noted that biology—and not family relationship—was the only issue to be considered. Accordingly, summary judgment was granted for respondent, who was adjudicated to be decedent's biological son and sole heir.

Contrary to appellant's assertion, *Palmer's* holding is not limited to or based on its specific facts. The supreme court concluded that parentage—for the purposes of intestate succession—may be established by clear and convincing evidence apart from the Parentage Act and its time limitation for bringing actions to determine paternity. *Palmer,* 658 N.W.2d at 197. The supreme court based its decision on the permissive nature of the word "may" in the state probate code, which reads:

If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person:

. . . .

(2) In cases not covered by clause (1) [addressing adoption], a person is the child of the person's parents regardless of the marital status of the parents and the parent and child relationship *may* be established under the Parentage Act, sections 257.51 and 257.74.

*Id.* at 199 (emphasis added) (variation in original) (citing Minn.Stat. § 524.2–114 (2002)); *see also* Minn.Stat. § 645.44, subd. 15 (2002) ("may" is permissive).

The appellants in *Palmer* argued that the word "may" was mandatory when read in context and that the statute of limitations in the Parentage Act should have been applied to bar the estate claim of a

nonmarital son. *Palmer*, 658 N.W.2d at 199. But in response, the supreme court noted that "[h]ad the legislature wanted parentage for probate purposes to be determined exclusively under the Parentage Act, it could have so provided." *Id.* The legislature did not so provide and the supreme court explained that the distinct purposes of probate and family law justified the legislature's decision not to make the Parentage Act the sole means of establishing paternity for the purposes of probate. *Id.* at 200.

Notably, the *Palmer* court relied heavily on the reasoning of the New Jersey Supreme Court, which distinguished the Parentage Act and Probate Code under New Jersey law as "independent statutes designed to address different primary rights." *Wingate v. Estate of Ryan*, 149 N.J. 227, 693 A.2d 457, 463 (1997); *see also Palmer*, 658 N.W.2d at 200 ("The New Jersey court's rationale is applicable to our law."). Elaborating, *Wingate* explains:

> The purpose of the Parentage Act is to establish "the legal relationship ... between a child and the child's natural or adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations." Child support is the major concern under the Parentage Act. The purpose of the Probate Code, on the other hand, is to determine the devolution of a decedent's real and personal property. *The different purposes the two statutes serve, help to explain why the Legislature contemplated different periods of limitations for filing claims under those statutes.*

*Wingate*, 693 A.2d at 463 (emphasis added) (citations omitted). *Wingate* and *Palmer* remain part of a nation-wide trend among various state appellate courts that have addressed a nonmarital child's right to establish parentage under a state's probate code. Most recently, the Hawaii Supreme Court followed suit and similarly concluded that "the [Parentage Act] is not the exclusive means by which to establish paternity for purposes of intestate succession." *Estate of Rogers*, 103 Haw. 275, 81 P.3d 1190, 1198 (2003) (surveying cases from a variety of jurisdictions across the nation).

Accordingly, the district court correctly interpreted *Palmer* and did not err in its application of the law by granting summary judgment to respondent. Appellant maintains that *Palmer* is distinguishable on its facts since Harold Reed served as respondent's "presumed father." But the fact that there was no "presumed father" in *Palmer* does not alter its applicability to this case where, as in *Palmer*, a nonmarital child seeks to assert his statutory rights under the probate code. The context of this proceeding—determining the devolution of a decedent's real and personal property—is determinative. *Palmer*, 658 N.W.2d at 200 (citing *Wingate*, 693 A.2d at 463). Moreover, application of the Parentage Act's statute of limitations to this case would make it virtually impossible for "undiscovered," nonmarital children to establish paternity since the Parentage Act requires this to be done no later than one year after the child reaches the age of majority. Minn.Stat. § 257.58. Such a result would clearly frustrate the aims of the legislature when it "sought to remove the distinctions between marital and nonmarital issue in inheritance claims" in Minn. Stat. § 524.2–114. *Palmer*, 658 N.W.2d at 199. Here, respondent did not even know that decedent was his biological father until approximately 14 years *after* reaching the age of majority. Because the district court properly applied the probate code in establishing paternity for purposes of intestate succession and finding respondent to be the sole heir of decedent's estate, it did not err and summary judgment

was properly granted in respondent's favor.[1]

## B. Other Arguments Raised

Appellant raises two other issues relating to the summary-judgment challenge. First, he argues that respondent has not met his "clear and convincing" burden of proof in establishing a parent-child relationship. But *Palmer* was clear in explaining that "parentage for the purposes of intestate succession may be established by clear and convincing evidence *apart from* the Parentage Act...." 658 N.W.2d at 199 (emphasis added). The district court noted the "overwhelming persuasiveness of a stipulation to DNA evidence establishing [ ] biological fatherhood" and determined that the clear-and-convincing standard had been met. Appellant maintains that biology cannot be the only factor in making the parent-child determination, but cites little applicable legal authority to support his position in the probate intestate-succession context. We hold that conclusive genetic proof can establish parentage under the probate code for purposes of intestate succession.

Second, appellant argues that public policy concerns dictate that his motion for summary judgment should have been granted because biology should not be the only factor in determining the parent-child relationship. In support, appellant cites *Witso v. Overby,* 609 N.W.2d 618 (Minn. App.2000), *aff'd,* 627 N.W.2d 63 (Minn. 2001). But *Witso* was a paternity, not a probate, case addressing the issue of whether an alleged father of a child born while the mother is married to another man has standing to bring an action to determine paternity. The majority in *Witso* held that the Minnesota Parentage Act establishes the putative fathers standing subject to statutory preconditions. Because *Witso* involved an analysis of the parentage act and not the probate statute, we do not find it persuasive in this context. *See Palmer,* 658 N.W.2d at 200 (distinguishing *Witso*). Appellants present reliance on *Witso* is similarly misplaced and his attempts to argue for a change in the law based on policy are not persuasive.

While we sympathize with the shock and surprise that appellant and his brothers understandably must have felt upon learning that their brother—the decedent—had fathered a child during his lifetime, we must nevertheless affirm the district court by concluding that the law does not provide them with a remedy here and that respondent—as decedents biological son—remains the sole heir of decedent's estate.

## II.

When reviewing evidentiary rulings, this court's "duty is to look to the record as a whole to determine whether, in light of the evidence therein, the district court acted arbitrarily, capriciously, or contrary to legal usage." *State v. Profit,* 591 N.W.2d 451, 464 n. 3 (Minn.1999) (quotation omitted). Evidentiary rulings rest within the sound discretion of the district court, and will not be reversed absent an abuse of that discretion. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45–46 (Minn.1997).

Appellant argues that the district court abused its discretion when it admitted genetic-testing results from the Orchid GeneScreen lab that had been derived from a mailing envelope that allegedly had decedent's DNA on it. Those test results showed that the individual who handled

---

1. Appellant also raises an equitable laches argument, which we determine to be without merit.

the envelope was—to a 99.99% degree of certainty—the decedent and father of respondent. Appellant asserts that the admission of this evidence resulted in his removal as personal representative and loss of partial attorney fees. He further claims that "[s]uch inadmissible evidence prejudiced the entire proceeding." We disagree.

In ruling on the admissibility of the preliminary genetic-test results, the district court was careful to balance the competing claims of its authenticity in reaching its ultimate decision to admit the evidence. While recognizing that no one actually observed decedent handling the envelope, the district court based its ruling on highly persuasive circumstantial evidence:

> [I]t should be noted that the envelope bears the name and return address of [decedent]. While not dispositive of the issue of paternity, the DNA test results received from Orchid GeneScreen and submitted to this court are persuasive. The evidence must, of necessity, be considered along with the clear and unequivocal testimony of Lucille Reed, Robert Reed, and the other affiants [who also testified to its authenticity].

The district court went on to address each of appellant's four objections regarding (1) a disclaimer of the results; (2) timeliness; (3) foundation; and (4) lack of time to secure an opposing expert witness. In overruling the objections, the district court ultimately found that "[t]he cumulative effect of all evidence presented by [respondent] at this stage of the proceedings is that [he] has made a substantial and credible preliminary showing that he is the son and rightful heir of [decedent]."

Based on the standard of review regarding admissibility of evidence, we conclude that the district court carefully weighed the evidence and did not abuse its discretion in admitting the genetic-test-

ing results. Moreover, beyond the inevitable removal of his position as personal representative and the loss of certain attorney fees, appellant has failed to show how he has been prejudiced by admission of this evidence when he later stipulated to the very conclusions supported by that evidence. *See Midway Ctr. Assocs. v. Midway Ctr., Inc.,* 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (explaining that to prevail on appeal, a party must show error and that the error caused prejudice).

## III.

■ The district court has discretion to determine suitability of a personal representative, and that determination will not be reversed absent an abuse of discretion. *Crosby v. Hunt (In re Estate of Crosby),* 218 Minn. 149, 157–58, 15 N.W.2d 501, 506 (1944). This court will not reverse the district court's determination regarding removal of a personal representative unless the district court clearly abused its discretion by disregarding the facts. *In re Estate of Michaelson,* 383 N.W.2d 353, 356 (Minn.App.1986).

■ Appellant argues that the district court abused its discretion when it sua sponte removed appellant as the personal representative of decedent's estate and replaced him with respondent, without notice and without findings that removal was in the best interests of the estate, as required by Minn.Stat. § 524.3–611 (2002). While we agree that the district court failed to follow the correct procedure in removing appellant as personal representative, we nevertheless affirm the removal.

After concluding that the cumulative evidence, based on the DNA evidence and various affidavits, established that respondent had made "a substantial and credible preliminary showing that he [was] the rightful heir of [decedent]," the district

court vacated its previous order appointing appellant as personal representative and appointed respondent as the new personal representative. The court acted sua sponte, without motion by either of the parties, based on the evidence that respondent was, in all likelihood, "the son and rightful heir of [decedent]."

Various provisions of the Uniform Probate Code (UPC) govern the termination of a prior personal-representative appointment. One of them broadly explains the appointment procedure:

> *After notice* to interested persons, including all persons interested in the administration of the estate as successors under the applicable assumption concerning testacy, any previously appointed personal representative and any person having or claiming priority for appointment as personal representative, *the court shall determine who is entitled to appointment under section 524.3-203, make a proper appointment and, if appropriate, terminate any prior appointment found to have been improper as provided in cases of removal under section 524.3-611.*

Minn.Stat. § 524.3-414(b) (2002) (emphasis added). In listing the priorities among persons seeking appointment as personal representative, the UPC lists "other heirs of the decedent" as having priority for appointment when a will, devisee, or spouse are not available. Minn.Stat. § 524.3-203(a)(5) (2002). Another provision then explains the removal procedure and when cause exists for such removal:

> (a) A person interested in the estate may petition for removal of a personal representative for cause at any time. Upon filing of the petition, the court shall fix a time and place for hearing. Notice shall be given by the petitioner to the personal representative, and to other persons as the court may order. . . .

> (b) Cause for removal exists when removal is in the best interests of the estate, or if it is shown that a personal representative or the person seeking the personal representative's appointment intentionally misrepresented material facts in the proceedings leading to the appointment, or that the personal representative has disregarded an order of the court, has become incapable of discharging the duties of office, or has mismanaged the estate or failed to perform any duty pertaining to the office. . . .

Minn.Stat. 524.3-611 (2002). There are no pertinent authorities adequately addressing the relationship between these UPC provisions in Minnesota. Nevertheless, the provisions suggest that the court can terminate prior personal-representative appointments when cause exists for such a removal, provided certain procedures are followed. A number of sister courts that have addressed the personal-representative removal procedures of the UPC have reversed and remanded when the district court failed to conform to the proper removal procedures. *See, e.g., Beal v. Weingarten (In re Estate of Weingarten),* 10 Neb.App. 82, 624 N.W.2d 653, 656–57 (2001) (reversing and remanding a sua sponte removal for failure to provide proper notice and hearing); *Estate of Boyer v. Morrison,* 117 N.M. 74, 868 P.2d 1299 (Ct.App.1994) (reversing and remanding a removal where the district court failed to state a basis for the removal).

■ But here, appellant's procedural challenge to his removal and respondent's appointment as personal representative comes too late in the process. First, a review of the record reveals that both parties had notice of the district court's intention to remove appellant from his position as personal representative at the motion hearing. Neither party objected at that time. Second, when it issued its re-

moval order, the district court had already received convincing evidence that respondent was decedent's biological son, based on various affidavits and the preliminary genetic testing performed by Orchid GeneScreen. Later, after decedent's exhumation and further testing, the parties stipulated to this fact.

Nonetheless, we note that the court did not follow the proper procedure when it sua sponte removed appellant and appointed respondent as personal representative of decedent's estate. Minn.Stat. § 524.3–611(a) requires both that notice must be given and that a hearing must be held before a personal representative can be removed. Even in emergency situations where a court must restrain a personal representative by temporary order from performing his fiduciary duties, notice must be given to the personal representative and a hearing on the issue must be set within ten days. Minn.Stat. § 524.3–607 (2002); see also Weingarten, 624 N.W.2d at 656 (interpreting analogous UPC provision as requiring that hearing be set within ten days of temporary order restraining personal representative and that notice be given).

Despite the district court's divergence from the prescribed removal procedure, we decline to remand and conclude that the procedural oversight was not an abuse of discretion in light of the specific circumstances of this case. Our conclusion is supported by the overwhelming evidence known to the district court at the time it acted that respondent was in all likelihood the biological son of decedent and the patently divergent interests between the parties. See Minn. R. Civ. P. 61 (requiring harmless error to be ignored); Grein v. Grein, 364 N.W.2d 383, 387 (Minn.1985) (declining to remand and affirming the district court in a child-custody case where "from reading the files, the record, and the

court's findings, on remand the [district] court would undoubtedly make findings that comport with the statutory language" and reach the same result).

## IV.

■ "The standard of review for an appellate court examining an award of attorney fees and costs is whether the district court abused its discretion." Minn. Council of Dog Clubs v. City of Minneapolis, 540 N.W.2d 903, 904 (Minn.App.1995), review denied (Minn. Jan. 25, 1996). Appellant argues that the district court abused its discretion when it denied certain attorney fees to appellant during a portion of the time appellant served as personal representative of decedent's estate. The basis for an award of attorney fees to personal representatives is governed by statute. "Any personal representative ... who defends or prosecutes any proceeding in good faith, whether successful or not, ... is entitled to receive from the estate necessary expenses and disbursements including reasonable attorneys' fees incurred." Minn.Stat. § 524.3–720 (2002).

The basis for the district court's denial of these fees was linked to the preliminary genetic-test report prepared by Orchid GeneScreen. As previously noted, that report concluded that the testing of an envelope reflected a 99.99% probability that the individual handling the envelope was the biological father of respondent. The district court denied fees to appellant after he received this information, reasoning:

The [c]ourt believes that on [May 7, 2003, appellant], in his capacity as [p]ersonal [r]epresentative of the [e]state, was made aware of the existence of credible evidence that [respondent] was the son and an heir of [decedent]. At that point, the [c]ourt believes that [appellant] and his counsel were under an affirmative duty to cooperate with [re-

spondent] and his attorneys in their efforts to investigate the issue of paternity through appropriate genetic testing.

Because the district court questioned the propriety of appellant's behavior in pressing the case forward, it ultimately awarded appellant fees up to May 7, 2003. A majority of the billings after that date were found to be inappropriate and excessive, and were thereby disallowed.

Appellant ties his argument for attorney fees back to the alleged inadmissibility of the Orchid GeneScreen test results. The argument is a circular one: if the test results are inadmissible, appellant argues that they should not form the basis for a denial of appellant's attorney fees. But as that evidence was properly admitted and the proper statutory standard was applied, the district court did not abuse its discretion in awarding appellant fees up to the date of receipt of such evidence, which put appellant on notice that respondent was— to a 99.99% degree of certainty—the biological issue of decedent.

## DECISION

Because the district court did not err in permitting parentage to be established by the probate code for purposes of intestate succession, we affirm the district court's grant of summary judgment in favor of respondent. In addition, the district court did not abuse its discretion in admitting preliminary genetic-test results into evidence, by removing appellant as personal representative of decedent's estate, and by denying appellant certain attorney fees.

**Affirmed.**